449 So.2d 1134 (1984)
Lillian JOHNSON, Plaintiff-Appellee,
v.
BELLEFONTE INSURANCE COMPANY, Defendant-Appellant.
No. 83-595.
Court of Appeal of Louisiana, Third Circuit.
April 11, 1984.
*1135 Woodley, Barnett, Cox, Williams, Fenet & Palmer, Robert W. Fenet, Lake Charles, for defendant-appellant.
Jones, Jones & Alexander, J.B. Jones, Jr., Cameron, for plaintiff-appellee.
Before GUIDRY, FORET and CULPEPPER, JJ.
CULPEPPER, Judge.[*]
This is a suit for damages for personal injuries sustained by the plaintiff, Lillian *1136 Johnson, when she slipped and fell on an icy sidewalk outside of her leased apartment. The defendant, Bellefonte Insurance Company, is the insurer of Palme Chalet Apartment Complex, hereinafter referred to collectively as "Defendant." Plaintiff seeks recovery on the grounds of the negligence and/or strict liability of defendant. The defendant pleaded contributory negligence and/or assumption of the risk. A jury of 12 held: (1) That the apartment operator was negligent; (2) that plaintiff was contributorily negligent; (3) that 50% of the fault which caused the damages was attributable to defendant and 50% to plaintiff; (4) that the icy sidewalk was "defective"; (5) that plaintiff did not assume the risk; and (6) that the amount of plaintiff's damages are $20,000 for pain, suffering and disability, $40,000 for past medical expenses and $20,000 for future medical care, a total of $80,000. The district court judgment did not reduce the jury's award of damages in proportion to the percentage of fault attributable to plaintiff. The defendant appealed. Plaintiff answered the appeal, seeking an increase in the award.
After the trial during March of 1983 and the appeal, the plaintiff died on December 29, 1983. Her brother and sister, Edward Nunez and Bessie Nunez Welch, were substituted as parties plaintiff.
Defendant's first specification of error is that the district court erred in failing to grant its exception of no cause of action and motion for summary judgment directed against plaintiff's claim based on strict liability. Defendant argues the sidewalk itself had no defect, that the ice was an act of God and that therefore there is no strict liability under LSA-C.C. art. 2695 which holds the lessor liable to the lessee for damages caused by a vice or defect in the thing leased. We pretermit this issue because we find no manifest error in the jury's verdict that the defendant was negligent, and because it is our view that the result would be the same whether defendant's liability is based on negligence or strict liability. We conclude, for reasons set forth hereinafter, that contributory negligence is a defense to both strict liability and negligence in a case of this type.
The issues which we must address are: (1) Was the jury manifestly erroneous in finding as a fact that the defendant was negligent? (2) Was the jury manifestly erroneous in finding as a fact that the plaintiff was contributorily negligent? (3) Was the jury manifestly erroneous in finding as a fact that 50% of the fault which caused the damages was attributable to defendant and 50% to plaintiff? (4) Was the jury manifestly erroneous in finding as a fact that plaintiff did not assume the risk? (5) Did the district court err in admitting into evidence hospital records and medical bills without expert medical expert testimony to connect those documents to the accident on January 14, 1982? (6) Did the jury abuse its discretion in finding the amount of damages, as itemized above? (7) Is contributory negligence a defense to strict liability in a case of this type? (8) Did the district judge err in failing to reduce the jury award in proportion to the percentage of fault attributed to the plaintiff?

GENERAL FACTS
Lillian Johnson, 83 years of age, had lived alone in the Palme Chalet Apartments in Lake Charles for about nine years at the time of the accident in question on January 14, 1982. In this apartment complex, each building has four units, two below and two above, with a metal stairway which descends outside from an upper balcony in the middle of the building to the ground floor where the front entrances are located. There are 112 apartments in the complex.
The evidence shows that before this accident Lillian was active and in good health for her age. She walked where she wanted, drove her own car without glasses and did all of her own housework.
On the day before the accident, it had rained, and that night the weather turned cold causing a hard freeze. On the morning of January 14, 1982, the weather was clear and sunny, but there was ice on the outside steps and on the outside sidewalks.
*1137 Plaintiff's brother, Ed Nunez, had telephoned and arranged for them to go to the Picadilly Cafeteria for lunch at 11:30 A.M. Ed arrived, parked his car in back of the apartment, and came in the back way, gaining access to the stairway by use of stepping stones which were on the opposite side of the stairway from the sidewalk in question where Lillian slipped. Ed went up the stairs to Lillian's apartment, which is on the left facing the front. He saw ice on the edges of the steps on his way up. Ed testified that when he greeted his sister at her front door, she warned him that they must be careful because of the ice. According to Ed's testimony, he preceded Lillian down the metal steps, which go out from the upper balcony to a landing and then back toward the front entrances of the downstairs apartments. There was no ice on the steps, except possibly on the outer edges, because they had been exposed to the bright sunlight since early morning. Also, there was no ice on the sidewalk at the foot of the stairs near the front entrances, because this portion of the sidewalk was covered by the upper balcony. Mr. Ed testified that when they reached the bottom of the stairs and started walking on the sidewalk which leads out from the front entrances, he saw a solid sheet of ice across the sidewalk a few feet from the front of the building. To avoid walking on this ice, Ed walked on the grass at the edge of the sidewalk. Lillian came behind him and she walked onto the ice on the sidewalk. Her feet slipped out from under her, and she fell backwards striking her elbow and the back of her head on the concrete. Pictures filed in evidence show that the spot where she fell was five or six feet from the front of the building. The evidence indicates that although the sun had melted the ice on most of the sidewalks by that time, this particular spot where Lillian slipped was shaded, apparently by the stairway landing, and the ice had not melted there.
The complex maintenance man, Dallas Fontenot, happened to be in the upstairs apartment opposite Ms. Lillian's changing filters for the tenants. Fontenot testified that although he had been in the area that morning and seen the ice and had warned some of the tenants to be careful, he did not warn the plaintiff or Ed of the ice when they came out of Lillian's apartment, because he had seen Lillian out visiting another tenant that morning and thought that she knew about the ice and that it was unnecessary to warn her.
After Lillian fell, Fontenot immediately came down the stairs and assisted in lifting her up and calling an ambulance which took Lillian to St. Patrick's Hospital in Lake Charles. The injuries and medical expenses will be discussed in more detail later.

DEFENDANT'S NEGLIGENCE
The first issue is whether the jury was manifestly erroneous in finding the defendant apartment complex negligent. At the outset, we will explain why we decide this case on the basis of negligence rather than strict liability. In the recent case Entrevia v. Hood, 427 So.2d 1146 (La.1983), the question was whether the owner of a remote, unoccupied farm house, which was surrounded by a fence and posted with "No Trespassing" signs, was strictly liable for damages occasioned when a trespasser was injured by the collapse of the building's rear steps. Our Supreme Court explained that the judicial process for deciding strict liability by the owner for maintaining a hazard which presents an unreasonable risk of injury to others is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem. The court explained further, that a difference between the two theories is that under strict liability the custodian of the thing is presumed to have knowledge of its dangerous condition before plaintiff's injury, but under a negligence theory knowledge by the defendant of the hazard is not presumed and must be proved. A major distinction between the two theories is that the inability of the defendant to know or prevent the risk is not a defense in strict liability but precludes the finding of negligence.
*1138 Using this explanation in Entrevia, we find the evidence in the present case clearly shows that the defendant's maintenance man, Fontenot, knew that there was still ice on shaded portions of the outside sidewalks, and he knew that this presented a risk of harm to the tenants, most of whom were elderly and retired. The question of whether the defendant was able to prevent the risk, by either remedying it or warning of it, is not as clear from the evidence, but we conclude there was sufficient evidence to support the jury's verdict that defendant was negligent. Plaintiff introduced the testimony of an expert safety consultant that the ice could have been removed from the sidewalk by using sand, salt or water. Of course, Dallas Fontenot, the maintenance man, could have warned plaintiff of the presence of the ice which the jury could have reasonably found that he saw or should have seen on the sidewalk as he entered the building.
Since we can decide this case on the basis of negligence, we choose to base our decision on that theory rather than strict liability, because the result is the same, in view of our conclusion explained hereinafter that contributory negligence is a defense in this type of case to either negligence or strict liability. Moreover, by using negligence instead of strict liability, we need not decide whether ice on an outside sidewalk in an apartment complex presents an unreasonable risk of injury to the tenants, making the owner strictly liable regardless of whether the owner knew of the hazard or was able to remedy it or warn of it. Counsel stated during oral argument that they had found no Louisiana case deciding this question. We have found none, and we are reluctant to set a precedent which could have far reaching consequences in similar cases involving ice on sidewalks, roadways, bridges, etc.
For the reasons which we have already mentioned above, we conclude that the defendant was negligent. The icy sidewalk clearly presented an unreasonable risk of injury to the tenants, the defendant knew about the hazard, and there was sufficient evidence for the jury to find as a fact that the defendant could have remedied the hazard or warned against it.

CONTRIBUTORY NEGLIGENCE
The next issue is whether the jury was manifestly erroneous in finding as a fact that the plaintiff was contributorily negligent. Two witnesses testified they had seen Lillian outside earlier that morning on the sidewalks. Dallas Fontenot, the maintenance man, said he saw plaintiff walking down the sidewalk towards her apartment at about 11 o'clock a.m. Lavonia Dews, a tenant, testified plaintiff had visited the Dews' apartment earlier that morning. As stated above, plaintiff's brother, Ed Nunez, testified that when he greeted his sister at her front door, she warned him to be careful of the ice. Clearly there was sufficient evidence to support a finding by the jury that plaintiff knew about the ice on the sidewalk.
As stated above, Ed Nunez also testified that after they reached the bottom of the stairs and started walking out from the front of the building, he walked on the grass to avoid the solid sheet of ice in the shade across the sidewalk. Lillian did not follow Ed onto the grass. Instead, she walked onto the ice and slipped.
The above evidence was clearly sufficient to support the jury's finding of fact that Lillian was contributorily negligent. The district judge correctly charged the jury that contributory negligence is a question of fact to be determined under the circumstances of each case, and that the critical inquiry is whether the plaintiff exercised ordinary care for her own safety at the time of the accident. The jury found she had not.

APPORTIONMENT OF FAULT
The next question is whether the jury was manifestly erroneous in attributing to defendant 50% and to plaintiff 50% of the fault which caused the injury. The parties have not argued error in this regard. We find none.

*1139 ASSUMPTION OF THE RISK
The next issue is whether the jury erred in failing to find that plaintiff assumed the risk. In Dofflemyer v. Gilley, 384 So.2d 435 (La.1980), our Supreme Court defined assumption of the risk as follows:
"It is fundamental that, in order to assume a risk, one must knowingly and voluntarily encounter a risk which caused him harm. Plaintiff must understand and appreciate the risk involved and must accept the risk as well as the inherent possibility of danger because of the risk."
In the present case, defendant argues that plaintiff had prior knowledge of the ice on the sidewalk at the spot where she fell, and that she nevertheless deliberately walked on the ice and accepted the risk of injury. Although, as stated above, we agree plaintiff had prior knowledge that there was ice on the sidewalks outside and that it was dangerous, we cannot agree that the jury was manifestly erroneous in finding that plaintiff did not assume a risk, i.e., that she did not deliberately walk on the ice in this particular spot and assume the risk that she might slip. The jury could have reasonably found that she was simply negligent, i.e., that she failed to use reasonable care to see the ice and to avoid walking on it.
We find no manifest error by the jury verdict that plaintiff did not assume the risk.

HOSPITAL RECORDS AND MEDICAL BILLS
The next issue is whether the trial judge erred in admitting into evidence certain hospital records and medical bills without expert medical testimony to connect those documents to the accident on January 14, 1982. The hospital records in question are plaintiff's exhibits P-3 through P-9. Each of these exhibits contains copies of hospital records of plaintiff's hospitalization for a certain period of time. Each set of records is properly certified by an official of the respective hospital in accordance with the provisions of LSA-R.S. 13:3714 which reads as follows:
"Sec. 3714. Charts or records of hospitals; admissibility of certified copy
"Whenever a certified copy of the chart or record of any hospital in this state, signed by the director, assistant director, superintendent or secretary-treasurer of the board of administrators of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the record is sought to be used may summon and examine those making the original of said record as witnesses under cross-examination. As amended Acts 1952, No. 519, Sec. 1; Acts 1966, No. 161 Sec. 1"
No physician testified for plaintiff in this case. During the trial, defendant objected to the admission of each set of hospital records on the grounds that the records alone do not connect the plaintiff's subsequent hospitalization and treatment to the fall on the ice in January of 1982. The trial judge overruled defendant's objections and admitted the records in evidence on the basis that the discharge summaries and other statements by physicians in the hospital records themselves sufficiently connect these subsequent periods of hospitalization to the fall in January of 1982. We have carefully examined all of these hospital records and agree with the trial judge's ruling.
Defendant states in its brief that it does not seriously object to P-3, which is the hospital record of St. Patrick Hospital for the period January 14, 1982 ending January 20, 1982, nor to P-4, which is the hospital record of St. Patrick Hospital for the period January 23, 1982 ending January 30, 1982. However, defendant argues that P-5, the records for the period March 19, 1982 ending April 9, 1982 and all of the subsequent records of hospitalizations are inadmissible.
Our examination of all of these subsequent hospital records shows that they contain *1140 statements by the physicians sufficient to connect these subsequent periods of hospitalization to the injury in January of 1982. For instance, the discharge summary signed by the treating physician, Dr. Paraguya, for the period of hospitalization March 19, 1982 ending April 9, 1982 states that plaintiff was admitted because of persistent pain in the left thigh and knee area, and that she was previously recently hospitalized following a fall where she suffered a cerebral concussion. This physician states that she complained of pain and weakness in the left knee to the extent that she had fallen backwards at her apartment several times when the left knee would give out on her and she would fall. Although the doctor could not find definite neurological abnormality, he did find evidence of prior existing osteoarthritis of the cervical spine and the left hip.
P-6 is the record of St. Patrick Hospital for the period July 8, 1982 ending July 23, 1982. P-7 is the record of St. Patrick Hospital for the period July 26, 1982 ending August 25, 1982. The discharge summaries in P-6 and P-7 signed by the physician state that she continued to have general pain and weakness in both legs and inability to walk alone.
After these two periods of hospitalization in St. Patrick Hospital, plaintiff and her family decided they would change doctors and hospitals. She went to Lake Charles Memorial Hospital where she was treated by Dr. Hutchinson, who associated Dr. Raggio. P-8, the hospital records of Memorial for the period September 25, 1982 ending October 19, 1982, contain the statement by Dr. Hutchison that this 84-year-old female was admitted for complaints of dizziness and loss of the use of her legs and arms and that "because of the history, it was felt that it was likely that this resulted or was aggravated by the fall that she experienced in January since this is when she began having symptoms." In P-9, the records of Memorial for the period December 3, 1982 through January 4, 1983, the physician states that she was diagnosed as having cervical myelopathy, and that "this was felt to be secondary to degenerative disease of the spine and probably aggravated or precipitated by a fall which she experienced earlier in the year when she slipped on a sidewalk."
LSA-R.S. 13:3714, quoted above, clearly states that properly certified hospital records "shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the record is sought to be used may summon and examine those making the original of said record as witnesses under cross-examination." In the present case, the records were properly certified and were received in evidence as prima facie proof of their contents. The records themselves contained statements by physicians such as those mentioned above which clearly connect these subsequent periods of hospitalization to the injury in January of 1982. Under the statute, the defendant had the right to summon under cross-examination the physicians or other persons who made the originals of the records. This was defendant's relief if it desired to cross-examine the physicians who made the records. We conclude the hospital records were correctly admitted into evidence.
Regarding the medical bills, Ed Nunez testified that after his sister's fall he took care of all of her business and paid all of her bills. The hospital bills in question are identified by Ed as being those for the different periods of hospitalization as well as bills for sitters both in the hospital and at home and for other medical expenses. Ed identified P-12, P-13 and P-14 as being all of the medical bills through the date of trial, totaling $50,253. P-15 and P-16 are the bills for nursing homes to which plaintiff was admitted a month or two before trial. According to Mr. Ed's testimony, these records show that the monthly expense of nursing home care which would be required for the indefinite future was $3,996. The total for medical expense and nursing homes to the date of trial is $55,087.
Defendant objects to the introduction of the medical bills essentially for the same *1141 reason that it objected to the hospital records, i.e., that no physician was called by the plaintiff to connect these expenses with the fall in January of 1982. We conclude the trial judge correctly overruled defendant's objections to these bills and admitted them into evidence. The hospital records along with the testimony of Mr. Ed and the bills themselves clearly connect all of these expenses to the fall in 1982.

AMOUNT OF DAMAGES
The next issue is whether the jury abused its discretion in finding the amounts of damages as itemized above. Plaintiff argues the award for pain, suffering and disability should be increased from $20,000 to $300,000, that the award for past medical should be increased from $40,000 to $55,087, and that the award for future medical expenses should be increased from $20,000 to $316,483.
As regards the award of $20,000 for pain, suffering and disability, plaintiff emphasizes that before the accident in January of 1982, plaintiff was active and in good health for her age, that she walked without help, drove her own car and did her own housekeeping. She also testified, by deposition, that she had never previously been hospitalized. After the accident she never fully recovered. On those occasions when she was allowed to go back to her apartment, she had to use a walker and have sitters around the clock. Her chief complaint was weakness and pain in her legs which caused her to fall at home several times. She was in and out of the two hospitals for about a year after the accident and then was in a nursing home for about three months up to the date of trial.
Although we agree with the plaintiff that the jury could have reasonably made a greater award for general damages, we do not find that the jury abused its much discretion as to the quantum for this item.
Plaintiff next complains of the award of $40,000 for past medical expenses, arguing that the evidence clearly shows the expenses for hospitals, physicians, drugs and nursing homes, etc. totaled $55,087 to the date of trial. We do not know how the jury reached an award of $40,000 for this item. It could be they thought some of the medical expenses were not sufficiently connected with the accident, as defense counsel argued in his objections during the trial and in his argument to the jury at the conclusion of the trial. $40,000 was apparently an estimate by the jury of the amount of medical expense which they thought was sufficiently connected to the accident. Using this rationalization, we conclude the jury did not abuse its discretion as to past medical expense.
As to the award of $20,000 for future medical expense, plaintiff argues that the evidence shows it cost $3,996 per month to keep Lillian in a nursing home and her life expectancy was 6.6 years, which would be $314,483 for nursing home care alone.
Again, we have difficulty rationalizing how the jury arrived at an award of $20,000 for future medical expense. Defendant did introduce the testimony of Dr. Gerald Litel, a neurosurgeon, who had seen plaintiff in February of 1979 for cervical arthritis and spondylolisthesis. This physician expressed the opinion that plaintiff would have probably deteriorated over the next three years without any aggravation of her condition by injury. Based on some such reasoning, the jury may have concluded plaintiff was entitled to only a portion of the future medical expenses claimed by plaintiff. We are unable to find that the jury abused its much discretion in this regard.
In summary, we find no abuse of discretion by the jury as to any of the items of damages.

CONTRIBUTORY NEGLIGENCE DEFENSE TO STRICT LIABILITY
We have stated above that regardless of whether we decide liability in this case on the basis of negligence or strict liability, plaintiff's contributory negligence is a defense. We base this statement on several decisions from our Louisiana *1142 Courts of Appeal, including this Court, which hold that contributory negligence in a negligence case has the same effect as victim fault in a strict liability case. Sumner v. Foremost Insurance Company, 417 So.2d 1327 (La.App. 3rd Cir.1982); Hebert v. United Services Automobile Association, 355 So.2d 575 (La.App. 3rd Cir.1978); Parker v. Hanks, 345 So.2d 194, 195 (La. App. 3rd Cir.1977); Edwards v. State Department of Transportation & Development, 403 So.2d 109 (La.App. 3rd Cir.1981); Godwin v. Government Employees Insurance Company, 394 So.2d 751 (La.App. 3rd Cir.1981); Sullivan v. Gulf States Utilities, 382 So.2d 184 (La.App. 1st Cir.1980), writ denied 384 So.2d 447 (La.1980). Several recent Law Review articles approve the use of contributory negligence as a defense to strict liability, except in certain types of cases such as those involving ultra-hazardous activities. Contributory Negligence When Should It Be A Defense In A Strict Liability Action?, 43 La.Law Rev. 801 (1983); Comparative Negligence And Strict Liability, 40 La.Law Rev. 403 (1980); Note, Victim Fault, Who Are You Really And What Were You Before?, 42 La.Law Rev. 1393 (1982).
In Dorry v. LaFleur, 399 So.2d 559 (La. 1981), plaintiff slipped and fell on a wet spot at a skating rink. Dicta in a plurality opinion states that contributory negligence should be a defense for strictly liable defendants where defendant's activity is "apparently innocuous" and produces no income. Since the skating rink was income-producing, the court did not allow contributory negligence as a defense. Thus, the court left a question as to the types of strict liability cases in which it may allow contributory negligence as a defense. We do not consider that Dorry controls our decision in the present case.
We are aware of the recent decision in Bell v. Jet Wheel Blast, 709 F.2d 6 (5th Cir.1983) in which this Federal Court takes the contrary position that under Louisiana law contributory negligence does not defeat a strict liability claim. The Federal Court states that although several decisions by Louisiana intermediate Courts of Appeal have equated contributory negligence with victim fault, the Louisiana Supreme Court has never squarely ruled on this issue.
Although we respect the views expressed by the Federal Court, and we are aware that our Louisiana Supreme Court has never squarely decided the issue, we conclude that the above cited cases correctly hold that contributory negligence is a defense in a strict liability case of this type.

REDUCTION OF AWARD IN PROPORTION TO CONTRIBUTORY NEGLIGENCE
The next issue is whether the district judge erred in failing to reduce the jury award in proportion to the percentage of fault attributed to the plaintiff by the jury. LSA-C.C. art. 2323, which became effective August 1, 1980, before the accident in the present case, provides that when contributory negligence is applicable to a claim for damages "the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury."
Having chosen for the reasons set out above to decide liability in this case on the basis of negligence, it is clear that contributory negligence is applicable to the claim for damages. Under the clear language of Article 2323, quoted above, the amount of damages awarded by the jury must be reduced by the percentage of negligence attributable to the plaintiff, i.e., 50%. This results in an award of $40,000.

DECREE
For the reasons assigned, the judgment appealed is amended by reducing the amount of the award from $80,000 to $40,000. Otherwise, the judgment is affirmed. The costs of this appeal are assessed one-half to plaintiff and one-half to defendant.
AFFIRMED, AS AMENDED.
NOTES
[*] Judge William A. Culpepper, retired Third Circuit Court of Appeal Judge, participated in this decision as an assigned judge pro tempore.