526 So.2d 266 (1988)
Marvin F. FOWLER, et al., Plaintiffs-Appellees, Daniel C. Beltz, et al., Plaintiffs-Appellants-Appellees,
Hugh Winfree, et ux., Plaintiffs-Appellees,
v.
Bobby R. ROBERTS, et al., Defendants-Appellants, Appellees.
Nos. 19570-CA, 19571-CA and 19606-CA.
Court of Appeal of Louisiana, Second Circuit.
May 4, 1988.
Rehearing Denied May 26, 1988.
*268 Robert L. Roshto, Asst. Gen. Counsel, Baton Rouge, for Dept. of Public Safety, defendant-appellant.
Robert P. Hogan, Covington, for Beltz, plaintiffs-appellants-appellees.
Raleigh Newman, Lake Charles, for Winfree, plaintiffs-appellees.
R. Wayne Smith, Ruston, for Fowler, plaintiffs-appellees.
Theus, Grisham, Davis & Leigh by Charles H. Heck, Monroe, for defendant-appellee, State Farm.
Before MARVIN, JASPER E. JONES and SEXTON, JJ.
MARVIN, Judge.
In these consolidated actions for damages and wrongful deaths arising out of a multi-vehicle accident caused by a seizure-prone driver, the State Department of Public Safety appeals each of three judgments finding that it was equally and solidarily at fault with the afflicted driver and casting both for damages totalling over $1,250,000 in principal.
DPS was found at fault essentially because it renewed the driver's license of the seizure-prone driver in 1980 without inquiry about the driver's epileptic condition which was known to DPS when he first obtained his Louisiana license three years before and which had progressively worsened thereafter.
Along with the primary issues of cause in fact and whether the duty of DPS extended to protect against the risk created by this driver, DPS complains that the judgment awards special damages for medical expenses which were not "identified" or reasonably related to the accident.[1]
The plaintiffs in one suit also appeal, contending that the liability insurer of the seizure-prone driver, who paid policy proceeds shortly after suit was filed, should have been cast for the accruing legal interest on the respective awards to them and cast for court costs.
We amend in the one action in which plaintiffs appealed and in all other respects affirm the judgments.

*269 FACTS
Bobby R. Roberts was suffering from a seizure or the effects of a seizure while driving his Ford LTD on October 3, 1983. This caused his car to strike the rear of a Buick LeSabre operated by Evelyn Fowler, propelling it into an approaching Cadillac driven by Hugh Winfree and occupied by his wife and her elderly parents. Mrs. Fowler was killed instantly. Winfree's mother-in-law died a short time after the crash. The others were seriously injured.
Bobby R. Roberts, who was born in 1940, received a severe head injury in 1965 when he was struck in the head with a tire tool in an altercation with another after a traffic accident. His skull was fractured and he was left with brain damage, partial paralysis (hemiplegia) of his left side, poor memory, and later, seizure disorders which grew progressively worse. Because of his medical condition, he was unemployable. Roberts moved to Simsboro, Louisiana, from Texas and served as a lay minister in the Pentecostal church, preaching regularly for a number of years to the inmates each Sunday at the Lincoln Parish Detention Center.
Roberts's serious seizures began in 1969 and eventually became uncontrollable by medication prior to the 1983 accident. Medical testimony showed that Roberts was experiencing a seizure or a seizure-related episode when the accident occurred.
Roberts was hospitalized in 1975, 1976 and 1980 for seizures including status epilepticus, a life-threatening condition which arises when major seizures occur in uninterrupted sequence. He experiences grand mal-type seizures (loss of consciousness accompanied by major motor movements followed by a period, either hours or days, of mental confusion and depression). Roberts also experiences what he calls petit mal seizures. An expert explained that what Roberts describes as petit mal seizures are actually more serious psycho-motor seizures, which cause him to stare into space, become disoriented, and lose his ability to hear and communicate with others. A psycho-motor seizure also leaves Roberts mentally confused and depressed for hours or days, according to the experts.
In August 1980 Roberts sought treatment from a Monroe neurologist, Dr. Boykin, giving a history of uncontrollable seizures. Dr. Boykin prescribed anti-convulsive medication and thereafter regularly changed the dosage in an attempt to control the seizures. Notwithstanding this treatment, Robert's seizures were never controlled, according to Dr. Boykin. This doctor opined that during the three-year period before the accident, Roberts suffered multiple grand mal and psycho-motor seizures and needed frequent neurologic and psychiatric care. Dr. Boykin explained that he would not have allowed or recommended that Roberts be licensed to drive and that he assumed that Roberts was not driving because Roberts was well aware of his condition. Roberts essentially limited his driving to the trips he made each Sunday to preach at the Detention Center.
On the Sunday of the accident, Roberts became afflicted while preaching. A guard at the Detention Center saw Roberts drive his car off the road into a ditch. The guard went over to the car but Roberts insisted he was all right and drove away to Highway 167, where he turned north instead of west toward his home in Simsboro. He was seen driving very erratically with his head slumped over the steering wheel, alternately driving very slow and fast, sometimes stopping in the road, weaving on and off the road, and forcing several vehicles off the road.
He approached the town of Dubach, about 15 miles north of Ruston, at a speed estimated by the investigating officer to be at least 65 mph. He violently collided with the rear of the Fowler Buick which was proceeding north at about 30 mph, within the posted 35 mph limit. There was no indication that Roberts applied his brakes either before or after impact. The force of the impact propelled the Fowler car into the southbound Winfree Cadillac. Roberts's car thereafter came to rest in the road some 264 feet north of where it collided with the Buick. The Fowler car overturned against a steep embankment off the *270 road. Mrs. Fowler was found dead of catastrophic head injuries. The Winfrees and their passengers, Mr. and Mrs. Beltz, were seriously injured. Mrs. Beltz died shortly after reaching the hospital.

SOURCE OF DUTY
The Legislature has made DPS generally responsible for the "physical safety" of citizens and the "enforcement of laws and regulations pertaining to ... automobile and highway safety, motor vehicles and drivers." LRS 36:401B(1).
We emphasize other pertinent statutes which provide in part:
32:403.2:
Every physically handicapped person applying for a license ... for the first time shall attach to his application a detailed medical report ... from a physician indicating the severity of his disability and the limitations imposed thereby which might impair the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle. The department may waive the furnishing of said report by any person applying for a renewal license under the provisions of this Chapter.
32:414 E:
The department may conduct an investigation to determine whether the license shall be suspended, cancelled, or revoked upon a showing by its records or other sufficient evidence that the licensee:
. . . .
(5) Is incompetent to drive a motor vehicle.
. . . .
(8) Is afflicted with such mental or physical infirmities or disabilities as would constitute grounds for refusal of a license.
32:423:
The department upon issuing a driver's... license shall have authority whenever good cause appears to impose restrictions suitable ... to the licensee as the department may determine to be appropriate to assure the safe operation of a motor vehicle by the licensee.
The department may either issue a special restricted license, or may set forth such restrictions upon the usual license form.
The department may upon receiving satisfactory evidence of any violation of the restrictions of such license suspend or revoke the same but the licensee shall be entitled to a hearing as upon a suspension or revocation under this Chapter.
No person shall operate a motor vehicle in violation of the restrictions imposed in the license issued to him.
32:424:
The department, having good cause to believe that a licensed driver ... is incompetent or otherwise not qualified to be licensed, may upon written notice of at least ten days to the licensee require him to submit to an examination. Upon the conclusion of such examination the department shall take action as may be appropriate and may suspend or revoke the license of such person or permit him to retain such license, or may issue a license subject to restrictions as permitted under R.S. 32:423. Refusal or neglect of the licensee to submit to examination shall be ground for suspension or revocation of his license.
DPS explained that its policies and procedures for issuing and renewing a driver's license have been in effect, essentially unchanged, for many years before 1975. DPS produced extracts of several Policy-Procedure Statements written after 1975 and an "order" which states:
LOUISIANA DRIVERS LICENSE EXAMINERS MANUAL
1. Effective September 2, 1975, the Louisiana Drivers License Examiners Manual of Operating Instructions is hereby approved as the official policy and procedure guide for the Drivers License Division. This manual will supersede all previous editions of the Louisiana Drivers License Examiners Manuals.
. . . .
8. All Drivers License District Supervisors, Office Managers and Section *271 Heads will take such action as necessary to effectively implement this order.
DPS did not produce a copy of the manual in this record. The Policy/Procedure Statements of DPS provide in part:

"POLICY/PROCEDURE STATEMENT # 10.0
"Any physically or mentally handicapped person applying for an operator's license will also be required to submit a detailed medical report ...
"A physically or mentally handicapped person is any person having disabilities which would: impair the applicant's ability to exercise ordinary and reasonable control in the operation of a motor vehicle. Any disability which, in the opinion of the officer, does not affect the applicant's ability to operate a motor vehicle safely, does not require a medical report. You may waive the requirement for a medical report at renewal if the disability has been previously evaluated. However, when this condition has been previously evaluated, and the officer observes certain drastic changes, another medical report might be in order. A medical report may also be required at any time the officer has justifiable reason to believe the applicant has a condition which would hinder his ability to operate a motor vehicle safely and needs professional evaluation and treatment.
"EVALUATION: When the medical report is returned to the officer, the following consideration should be taken:
"1. The report should be complete and cover in detail the disability noted. If not, it should be returned for completion. This includes the release signature of the applicant.
"2. The question in regard to the doctor's opinion does not have to be answered, but it would be helpful. If the doctor does not make a recommendation commitment, and the report contains medicines which you are unfamiliar with and/or conditions which you, as layman, are unqualified to evaluate, then refer such reports to the Program Supervisor. The Supervisor will determine if valid reasons exist to refer the case to the Medical Advisory Board or to continue the process for licensing.
"If the opinion of the doctor is yes, you may continue with the examination process. However, if you note a questionable condition, either by observation or personal knowledge, which you strongly feel deserves further evaluation, then refer such a case to your supervisor in writing with specific reasons noted. The Supervisor will thoroughly evaluate the officer's reasons for disagreement, and if sufficient cause exists, refer such cases to Headquarters for referral to the Medical Advisory Board with written recommendations. If the disagreement is resolved after investigation by the Supervisor, the officer will continue the testing process. The supervisor, in either case, will note his findings in the remarks section of the report.
"If the applicant has submitted a medical report which was unsatisfactory and later presents a satisfactory report, both reports will be sent to Headquarters for referral to the Medical Advisory Board for recommendation. If you do not have a copy (officer should keep a copy) of the unsatisfactory report submitted earlier, send the satisfactory report with your remarks concerning the previous report to the Program Supervisor for referral to Headquarters.
"A report with the doctor's opinion `NO' will normally be considered sufficient cause for denying a license. This medical report should be sent to the Initial Data Entry Unit for microfilming, and notification of action taken should be sent to the applicant by Headquarters. If the Motor Vehicle officer disagrees with the doctor's `NO' reason, the report and officer's comments should be sent in writing to the Program Supervisor. The Program Supervisor, in turn will evaluate and determine if further investigation is needed.
"There may be times when re-examination and evaluation may be needed during the duration of the license due to the *272 progressive nature of the deficiency. This may be done by placing the appropriate restriction on the license. ... The officer must make proper notations that license was issued and which restrictions were given.
"When the officer issues a medical or visual report to any applicant and the applicant does not return within 60 days, a copy of the medical or visual form and/or the application will be mailed to the Initial Data Entry Unit for processing after the 65th day. The officer will note in the remarks section that the `applicant did not return.' Offices that have on-line capabilities should check the computer to see if a license has been issued. If so, send print-out of that license with the medical or vision report.
. . . .
"All approved medical or visual reports will be forwarded to Headquarters for microfilming. In the case of a new applicant, the approved medical or vision form will be attached to the application to be microfilmed along with that document. Medical and vision reports accepted at renewal must be forwarded to the Initial Data Entry Unit.

"POLICY/PROCEDURE STATEMENT # 23.0
"The Department, having good cause to believe that a licensed driver is incompetent or otherwise not qualified to be licensed, may upon written notice of at least 10 days to the licensee, require him to submit to an examination. Upon conclusion of such examination, the Department shall take action as may be appropriate and may suspend or revoke the license of such person or permit him to retain such license or may issue a license subject to restrictions as permitted under R.S. 32:423. Refusal or neglect of the licensee to submit to examination shall be grounds for suspension or revocation of his license.
. . . .
"These reports are to be sent into the Initial Data Entry Unit for review and evaluation. Each report must be evaluated to determine that the person or court has signed the complaint and it is limited to the fact that the individual involved is incapable of operating a motor vehicle safely. If any remarks are made about a physical, mental or visual informity, a medical report is required before a scheduling for a special exam.
. . . .
"All paperwork is to be returned to the Initial Data Entry Unit for final processing. If a periodic exam is required, this should be noted in the remarks section.
"If subject successfully passes special examination, operator's license will be issued indicating any restrictions to be added or deleted. The Initial Data Entry Unit must be contacted prior to issuance of operator's license so that suspend flag can be removed ... The results of special examination, along with any reinstatement fees required, must be forwarded immediately to Initial Data Entry so that case file can be completed.

"POLICY/PROCEDURE STATEMENT # 19.0
"The Department may conduct an investigation to determine whether the license should be suspended, cancelled or revoked upon showing by our records or other sufficient evidence that the licensee is afflicted with such mental or physical infirmities or disabilities as would constitute grounds for refusal of a license.
"The investigation conducted by the Department is initiated when a Motor Vehicle Officer screens a new applicant for a license or renewal of the license ...
"Upon receipt of such information by the Initial Data Entry Unit, the driving record of the individual is evaluated to determine if there are any suspensions, or pending actions imposed due to a problem relative to the applicant's ability to operate a motor vehicle safely. If there does exist a previous and/or current suspension or action, the case or material is pulled and reviewed to determine what course of action may be required and to halt any further issuance or renewal of the operator's license until final disposition is made.
*273 "The Department may require the individual to file a current medical report,... or submit to a special written and driving test.
"As stated before, new applicants or renewals are screened by field personnel and if a report is needed, the individual is advised of the type required before issuance or renewal of the operator's license ...
"If the individual returns with the required report, the Motor Vehicle Officer evaluates for completeness and based on established criteria must determine if all requirements have been met to issue or renew the license. If there is any discrepancy in the report, the Motor Vehicle Officer must either advise the individual a further report is needed ... by a specific date or advise the individual the report must be reviewed by the Motor Vehicle Officer's Supervisor before final disposition is made.
"If the individual fails to appear by the specified date, plus five (5) days, the Motor Vehicle Officer completes the rejection report and submits to the Initial Data Entry Unit for processing as stated before.
"If the Motor Vehicle Officer recommends a suspension due to the evidence on the medical report, the officer must submit a written report to the Supervisor for approval. The Supervisor may concur with the recommendations or require further information be obtained. In either event, the Supervisor must submit written instructions to the Motor Vehicle Officer or forward to Assistant Administrator for approval. The Assistant Administrator may concur with the recommendations or require further information be obtained; but in either event, must submit written instructions to the Program Supervisor or forward to the Initial Data Entry Unit for further action.
"Upon receipt of the medical or visual report from the field, the Initial Data Entry Unit proceeds with the recommendations as outlined on the report. The action taken, as outlined on the report, can be further medical reports required, review by the Medical Advisory Board, suspension, or denial of the operator's license.
"If a Motor Vehicle Officer recommends a re-evaluation in three (3) months, six (6) months or one (1) year, the Initial Data Entry Unit must calendar the request and on the date specified, correspond with the individual for the required medical reports. Upon return of required medical reports, based on established criteria, the Initial Data Entry Unit determines which of the following actions are to be taken: (1) further reports are to be furnished, (2) a suspension should be imposed, (3) scheduling for a special written and driving exam, or (4) review by the Medical Advisory Board. After a final disposition has been reached by Initial Data Entry, the reports or special exams from both field and Initial Data Entry Unit are microfilmed and added to the driving record by Data Processing. This will allow retrieval from microfilm in the event it is required in the future.
. . . .
"Attached is a medical examination form (DPSDL 2032) and the criteria used in evaluation:
"1. Release This portion must be signed by applicant which authorizes the Department to obtain any information we deem appropriate.
"2. History Lists pertinent information to help identify applicant and gives brief past medical history.
. . . .
"6. Neurological If a history of epilepsy is indicated and the date of the last seizure is not over one (1) year, this is an automatic suspension or denial of the operator's license. If the medication indicated is high dosage, medical form must be submitted to Medical Advisory Board for review. If the medical statement indicates the patient has been seen regularly by a doctor, is on medication and seizures are completely controlled, license may be issued or renewed. Only if the physician indicates further evaluation is needed from a doctor specializing in neurology, or if the individual has been suspended for seizures would the Department need a report from a *274 neurologist. If you are unsure about the applicant's history of seizures or medication recommend a review by the Medical Advisory Board.
"Reports To Be Presented To The Medical Advisory Board
"Upon receipt of any report requesting review by the Medical Advisory Board, the Initial Data Entry Unit will direct correspondence advising the individual of this request.
"Personnel assigned to attend Medical Advisory Board meetings must maintain a log of the cases to be reviewed and explicit instruction of what the Board recommends on each case. A copy of this log must be filed in each case file presented to the Board. Based on the recommendation of the Medical Advisory Board, one of the following can occur:
"1. Instruct applicant to obtain a new medical report from a specialist.
"2. Require applicant to pass the driving test.
"3. Approve reports to allow renewal or issuance of the license.
"4. Suspend or deny the driving privileges."
Records of the Medical Advisory Board referred to in the DPS Statements show that it functioned between the dates of January 23, 1972, and May 26, 1974, and after April 30, 1978, through December 8, 1984. During the 8½ years the Medical Advisory Board functioned it denied a license to most of the 119 persons whose records were reviewed because of "seizures" or "epilepsy," many with the notation, "must be seizure free for two years."
DPS explained that the Medical Advisory Board was inactive during some periods of time, including the year 1977. The Board's records indicate that it was inactive for about four years from May 16, 1974, until April 31, 1978, and do not show that Roberts's driver's license application or medical was ever referred to the Board.
DPS supervisory personnel from its Baton Rouge office, on the one hand, testified that DPS had instructed its "field" examiners or officers to inform each driver with a seizure disorder that he or she is required to report all seizures to DPS and voluntarily surrender his or her license until medical evidence shows no seizure for a year.
On the other hand, however, the "field" officers and examiners testified that they had not heard or read of such policy and that they had never given such instructions to any driver or applicant. The "field" employees who dealt with Roberts testified that no such instructions were given to him. Roberts testified that he was not given such instructions.

ROBERTS'S DPS RECORD
Roberts first applied for a Louisiana license in 1975. On his application as a "new driver" on October 31, 1977, he answered that he had been "denied" a Louisiana license in the Ruston DPS office in 1975 because of his seizures. He answered that he "had epilepsy," and "explain[ed]: Seizures as a result of auto accidentno seizure since October 1976under medication to control them." His application also shows that his DPS Medical Examination Form, dated October 28, 1977, and signed by a doctor, was "Approved by Supervisor." The 1977 application and medical form showed that Roberts had "hemiplegia" (a paralysis resulting from brain injury) or "poor use of his left arm and leg." This caused DPS to enter on the 1977 license and the 1980 license an "05" restriction that limited Roberts to driving a vehicle with "automatic transmission."
The 1977 Medical Form confirms that Roberts had a "head injury ... skull fracture, 1966;" that he last had a "seizure" in 1976; that he is taking "Dilantin... 100 mg TID" and "meberal ... 1 TID;" that Roberts was under "regular medical care;" and that his "seizures [are] completely controlled." The doctor who completed the DPS Medical Form died thereafter and Roberts began to see Dr. Boykin, a Monroe neurologist, in 1980.
Roberts was issued a Louisiana driver's license in late 1977 without any indication thereon to alert anyone that Roberts was under medical care and was taking medication *275 for seizures. In April 1980, Roberts returned to the Ruston DPS office to renew his license. DPS field employees automatically renewed the license for four years without inquiring about, or being alerted to, Roberts's epileptic condition. The 1977 and the 1980 licenses, however, did alert DPS personnel to the fact that Roberts's driving privilege was restricted to vehicles with an automatic transmission.
Shortly after the 1983 accident, a Ruston DPS examiner formally reported Roberts's condition to DPS stating the fact of the seizure-caused accident, reports of state police, and that Roberts "has been treated for a series of recent seizures that have not been reported to [DPS]." Roberts's license was revoked October 26, 1983, for "medical reasons," three weeks after the accident.
Notwithstanding the long-standing pre-1975 procedures as illustrated in the post-1975 Policy-Procedure Statements of DPS and in the testimony, and the fact that Roberts had a driver's license restricted to vehicles with automatic transmission, a Baton Rouge DPS supervisory employee testified that DPS did not have a system in operation for "flagging" a seizure disorders driver's license in 1977-1980. A Ruston field employee of DPS testified, however, that if Roberts's license had contained the "09" Special Restriction, which was then and is now used by DPS, an inquiry could or would have been made about the restriction.

SCOPE OF DUTY
The trial court recognized that the duty of DPS extended to protect the motoring plaintiffs against the risk that a driver, known to DPS in 1977 as an epileptic regularly treated and medicated for seizures, would not be issued a renewal license for four years in 1980 without inquiry to that driver and his neurologist about the risk.
The Legislature and the Policy-Procedure Statements of DPS directs DPS to carefully monitor the licensing procedures for such suspect drivers to protect the motoring public. See section, supra, on Source of Duty. In short, DPS is charged with protecting the physical safety of citizens by enforcing laws and regulating automobile and highway safety, motor vehicles, and drivers. 36:401(B)(1).
There is no test or rule by which the extent of the duty may be determined. Instead, scope of duty questions are to be resolved by inquiring into the purpose of the rule and into whether the particular plaintiff is among those persons the rule was designed or intended to protect. The inquiry has become established or known as the duty-risk analysis, of which foreseeability is but one factor, not necessarily controlling. The analysis is merely an analytical technique to be employed in an area of the law that requires careful reasoning and articulation, and is not itself a rule or test.
The keys for the solution of the issue of responsibility when there is more than one cause-in-fact of damages are (1) a determination of the exact risk or risks anticipated by imposition of the legal duty which has been breached and (2) the legal or policy considerations which grant excuses from certain consequences which follow an act of negligence. This requires, under the facts and the law of each case and the attendant exigencies, a jurisprudential determination which will implement and make effective our broad codal provisions concerning those who should respond in damages for their fault.
Resolution of the difficult scope of duty question must begin by recognizing two entirely different inquiries, one of fact (cause-in-fact), and the other, of legal policy. See Finley v. North Assur. Co. of America, 476 So.2d 837, 843, 844 (La.App. 2d Cir.1985)

CAUSE IN FACT?
It is not disputed that Roberts had one or more seizures which precipitated the accident. But for his driving his car while suffering from the effects of the seizures, the accident would not have happened. We agree with the trial court that his driving his car under such a circumstance was a substantial cause in fact of the accident.
*276 Cause in fact is a "but for" inquiry into the logical, and not absurd, extremes. 476 So.2d at 845.
DPS cites Guillot v. Sandoz, 497 So.2d 753 (La.App. 3d Cir.1986), writ denied, to support its argument that Roberts's mere possession of a driver's license was not a cause in fact of the accident. The trial court found Sandoz would have been driving with or without a license and the failure of DPS to suspend the license was not a substantial causative factor. The court said:
... Cause-in-fact is purely an issue of fact and the trial judge may draw such inferences from the evidence presented as are in accordance with logic and experience. His determination of factual issues is entitled to great weight and cannot be disturbed unless clearly wrong. Charles v. Durand, 442 So.2d 916 (La. App. 3d Cir.1983). The trial judge obviously considered Sandoz's dismal traffic record and concluded that the Department's failure to suspend his license was not a substantial factor or necessary antecedent without which the accident would not have happened. We find no error in that conclusion. 497 So.2d at p. 756.
Here the trial court said:
In this case, there is no indication that Mr. Roberts was not a law abiding citizen. On the contrary, he was a Pentecostal minister who exhibited a great sense of right and wrong. He indicated a willingness to follow the proper procedure in obtaining a license by returning to the Ruston field office in 1977 to obtain a second medical report following his one year seizure-free period. Mr. Roberts and his wife ... both testified that he would not, at that point in time, have driven without a valid license ... and this court finds that testimony to be entirely credible. Mr. Roberts sincerely believed that he would not be involved in an accident while he was engaged in his work at the prison camp ... Yet, he was conscious that, in his position as a minister, he must follow the laws of our state....
Furthermore, it would be absurd to say that in a case such as this, the department is free from liability because in all likelihood, the driver would have been on the highway even without a valid license. Such a finding would render every safeguard set forth by the department an exercise in futility. Louisiana Revised Statute 36:401(B) has expressly given the department the sole responsibility for the physical safety of the citizens and property of Louisiana, and this court cannot overlook that mandate by saying that regardless of what the department does to prevent it, the incompetent driver would defy the law and drive anyway.
The facts of Sandoz are inapposite. DPS is not charged here with the failure to suspend the license of one with a dismal driving record whom the trial court found would have been driving even without a license. DPS is charged here with failing to reasonably monitor and to exercise reasonable discretion in renewing, in 1980, for four years, the license of a driver, known to DPS as an epileptic since 1977.
Cause-in-fact is purely an issue of fact, the findings of which and the inferences from which are best made by the trier of fact. Sandoz, quoted supra.
DPS argues that Roberts's admission that he failed to take the prescribed medication on the Sunday of the accident compels the conclusion that the cause of the accident was not the license, but Roberts's failure to medicate himself. This argument supports the trial court's conclusion that Roberts's conduct was a substantial cause in fact. See Gambino v. Lubel, 190 So.2d 152 (La.App. 4th Cir.1966), writ denied. The exasperating scope of duty issue usually arises where there is more than one cause in fact of damages. Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821, 831 (1971). Moreover, the argument overlooks the uncontradicted fact that Roberts's seizures had not been controlled by the medication after 1979. Roberts does not appeal and did not contest that his conduct was A cause in fact of the accident. We are concerned *277 only with whether the conduct of DPS was a substantial cause-in-fact. It was.

POLICY INQUIRIES
Proper analysis requires inquiry into policies underlying the statutes and DPS regulatory procedures. Why were the statutes and regulations adopted? What risks were contemplated? Did the Legislature and DPS envision that the license of some seizure-prone drivers would be automatically renewed for four years without inquiry by DPS? Would this court's denial of recovery render the protection of the statutes and DPS regulatory procedures meaningless? See Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 377 (1969-70). Compare Alessi v. Allstate Ins. Co., 400 So.2d 1089 (La.App. 1st Cir.1981), holding that a cause of action exists against DPS in a similar situation. See Stewart v. Schmeider, 386 So.2d 1351, 1358 (La.1980), holding that a public agency may be held liable for a breach of a duty owed to the general public.
We have no difficulty agreeing with the trial court that the Legislature adopted the statutes expressly to give DPS the responsibility and the authority to reasonably regulate and monitor the renewal of a driver's license of a known seizure-prone driver for the protection of citizens on or about the highways. The statutes and Policy-Procedure Statements of DPS also compel the conclusion that the stated risk is easily associated with the recognized duty.
The fact that the Legislature expressly allows DPS to waive the requirement of a medical report from a physically handicapped driver applying for a renewal license does not avail DPS under the circumstances of this case.
If the circumstances of the known physically handicapped driver applying for a renewal license reasonably indicate to DPS that the driver's condition is one which does not require periodical monitoring (such as a driver who has a lost extremity, or Roberts, who had paralysis-impaired extremities), DPS should be allowed to exercise reasonable discretion and waive the medical requirement on renewal.
On the other hand and where the circumstances either do, or should, reasonably indicate the contrary to DPS (such as a known seizure-prone driver taking medication to control seizures), DPS should be directed and allowed to require periodic medical monitoring of that driver's driving privilege. Even the DPS Policy-Procedures Statements recognize the difference in the two circumstances. The Legislature simply means that the discretion of DPS to require medical monitoring shall be exercised reasonably in the individual case.

BREACH
DPS subtly argues that the fact that Roberts's doctor in 1977 did not "recommend" further medical reports on the DPS medical form somehow excuses DPS from its duty to exercise discretion upon renewal of an Roberts's license thereafter.
DPS explains that the 1977 doctor should have so recommended on the form in the section entitled "REMARKS," which is placed there for this purpose. Even should we assume, however absurdly, that the 1977 doctor was telepathic and recognized the [implied?] invitation to make such a recommendation, this record shows only that the 1977 medical report on Roberts was sent to DPS in Baton Rouge and did not surface again until it was produced in response to this action that was filed seven years later in 1984. No one at DPS in Ruston or in Baton Rouge inquired of Roberts or checked his DPS records in 1980 to determine whether the seizures revealed to DPS in 1977 were still being controlled by medication.
Additionally, DPS offers other excuses why the duty should not be imposed on it. We recognize that policy reasons may excuse the imposition of a duty. See Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973).
DPS effectively states that because the law permits waiver of detailed medical reports *278 upon a license at renewal, DPS has chosen to waive medicals on all renewals because DPS does not have funds or personnel to do otherwise. According to one DPS supervisor, DPS does not inquire about physically handicapped drivers applying for a renewal unless the handicap is visible:
... You can't tell if a person's [going to] have a seizure or not unless he would actually have it [in the office], because that's not visible.
If he had [a seizure] in the office when he was applying for renewal, then you would pick that up as a seizure disordered driver?
That's correct.
Otherwise you wouldn't bother to even ask them?
We would have to ask everybody who came in, sir, and you would be criticizing people who are perfectly healthy.
That DPS supervisor also testified:
And there is no requirement of a renewal applicant who already enjoys a license for four years that he submit, at that point in time, at renewal, a current or fresh medical examination?
No, sir. The statute says that we may do it and therefore, we choose to waive all of them since we cannot require them in all cases.
DPS elicited testimony in an attempt to illustrate the shortcomings of a mandatory reporting system which requires doctors to inform DPS of seizure patients. Louisiana employs what is called a "voluntary reporting system." Debating which system better serves and protects the public does not assist resolving the issues in this appeal, because the procedures employed by DPS in this case show that DPS did not inform Roberts at any time that he was required to voluntarily report on his seizures or to voluntarily state whether he had any disability which affected his ability to drive when he applied for a renewal.
DPS also contends that the magnitude of the risk that a seizure prone driver might be involved in a fatal wreck does not justify "increased costs" to the driver and the state to reasonably monitor such drivers. Vague references are made by DPS about "longer lines" at DPS field offices and increased costs. The DPS system employed in this case provided absolutely no safeguards after the initial license was issued.
DPS has tracked traffic violations of drivers. DPS has placed restrictions on licenses for decades. To ask every driver at renewal about past or recent disabilities which affect driving is the statutory responsibility of DPS. To inquire about known handicaps is the statutory responsibility of DPS. To make such inquiries would fulfill the statutory responsibilities and would not "be criticizing people who are perfectly health" or be unreasonably burdensome or costly. See Stewart v. Schneider, supra. The "excuses" offered by DPS are lame, unsupported, and callous and do not rise to excuses of policy which limit the imposition of a statutory duty.
Other states have either recognized or imposed liability upon the driver's licensing agency for the failure to reasonably monitor a known seizure-prone driver. See Pendergrass v. State of Oregon, 74 Or. App. 209, 702 P.2d 444 (1984). Compare Oleszczuk v. State of Arizona, 124 Ariz. 373, 604 P.2d 637 (Ariz.1979), and Alessi v. Allstate, supra.

MEDICAL SPECIALS
DPS contended in the trial court that hospital records and medical bills of Mr. and Mrs. Winfree were improperly "identified" and were "not timely." DPS complained that it received copies the day of trial and did not have an opportunity to cross-examine witnesses. LRS 13:3714 controls introduction of the medical records:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that the party against whom the record is sought *279 to be used may summon and examine those making the original of said record as witnesses under cross-examination.
Medical records which conform to this statute are prima facie proof of their contents and are admissible under this express legislative exception to the hearsay rule. Duhon v. St. of La., Bd. of Supervisors of LSU, 516 So.2d 222 (La.App. 4th Cir.1987).
In advance of trial, the Winfrees indicated their intent to introduce medical bills and hospital records. Further, DPS did not avail itself of the opportunity to attend the depositions of the various medical witnesses for the Winfrees. DPS cannot complain that it was denied the opportunity to cross-examine. Compare Morris v. Southern Life & Health Ins. Co., 430 So.2d 792 (La.App. 5th Cir.1983).
DPS urges in this appeal that the medical bills in question were "hearsay" and that some of the medical charges were not connected or related to the injuries sustained in the accident. These are different grounds for the objection which need not be considered on appeal.
The fact, however, that an injured plaintiff has received certain bills for treatment is not inadmissible hearsay. The bills are admissible evidence of that fact. Howery v. Linton, 452 So.2d 295 (La.App.2d Cir.1984). Additionally, the hospital records and the testimony of plaintiffs and medical personnel who treated them reasonably "connect" the bills in question to the accident. Johnson v. Bellefonte Ins. Co., 449 So.2d 1134 (La.App.3d Cir.1984), writ denied. DPS made no effort in the trial court to specifically attack the connexity or reasonableness of any charge billed to plaintiffs and allowed by the trial court as special damages. Under these circumstances we shall not disturb the trial court's special damage award.

ROBERTS'S LIABILITY POLICY
The Beltz plaintiffs also appealed, complaining that the trial court's judgment dismissed Roberts's liability insurer, State Farm, and failed to hold State Farm liable in solido with Roberts for court costs and for accruing judicial interest on their judgment. The trial court dismissed State Farm because it had paid its $20,000 policy limits to plaintiffs within two weeks after the actions were filed in 1984.
This stipulation was made before trial:
At the time of said vehicular accident the 1979 Ford automobile owned and operated by BOBBY R. ROBERTS was insured for public liability by defendant STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, WHOSE LIABILITY LIMITS WERE $10,000/20,000/10,000. On October 8, 1984 State Farm made an advance payment of its bodily injury liability limit of $20,000 per occurrence by distributing same to the plaintiffs in these three consolidated cases in the following manner: $5,000 to the plaintiffs in CA No. 34,030; $6,500 to the plaintiffs in CA No. 34,810; and $8,500 to the plaintiffs in CA No. 34,035. No release was executed and no agreement was made by any of the plaintiffs in conjunction with their receipt of said advance payments from State Farm.
The Beltz plaintiffs contend that State Farm's policy should be construed to make State Farm liable for court costs and the accruing interest on their judgment.
Notwithstanding that the cover page of the policy declares that "IT IS WRITTEN IN EASY TO READ AND UNDERSTAND LANGUAGE," the policy language leaves much to be desired. The definition section of the policy does not define either the term "limits of liability," although the declarations page shows the monetary limits ($10,000 each person/$20,000 each accident/$10,000 property damage each accident), or the phrase "the amount due under this coverage."
In fact the liability coverage section of the policy in section A 1 obligates the insurer to "pay damages which an insured becomes legally obligated to pay because of bodily injury to others caused by accident that result from the use of [the insured's] car" without stating that insurer's obligation is limited by the policy limits written on the declarations page. Section A 2 refers to policy limits in stating that the *280 insurer "will not defend any suit after we have paid the applicable limit of our liability..." The quoted stipulation, however, clearly establishes State Farm's liability limits.
We emphasize these critical parts of the liability section A of the policy which follow the language of A 1 and A 2 quoted above:

In addition to the limits of liability, we will pay for an insured any costs listed below resulting from such accident.
1. Court costs of any suit for damages.
2. Interest on all damages owed by an insured as a result of a judgment until we pay, offer or deposit in court the amount due under this coverage.
. . . .
The Beltz plaintiffs contend that the quoted language is, at best, ambiguous and should be construed against the insurer and in favor of the insured and injured plaintiff. LRS 22:655.
With respect to court costs, the language is not ambiguous. In addition to the limits of liability, the insurer under the quoted language owes all court costs for which its insured is cast in this action.
Plaintiffs would have us construe the quoted language to the effect that until the insurer pays its policy limits and court costs and the interest which is accruing on their judgment, the insurer is obligated to pay all accrued and accruing interest owed by an insured as a result of the judgment. Plaintiffs argue that State Farm's payment of the $20,000 liability limits on October 8, 1984, did not fulfill its policy obligation.
State Farm contends that these issues were not raised in the trial court and should not be considered here, and alternatively, that the language should be construed to pronounce the result that was pronounced in Fletcher v. Leader Nat. Ins. Co., 513 So.2d 1226, 1228 (La.App. 4th Cir. 1987). There the policy language read
If you lose a lawsuit that we're defending, we'll pay the court costs, including court costs if we decide to appeal. We'll also pay interest on the full amount of the judgement even if the judgement is higher than the limits of liability. And we'll pay this interest from the day the judgement is entered until we've offered the other party the amount of the judgement up to the full limits of liability available under this insurance.
State Farm further asserts that we should agree with the trial court's result because the record shows that the Beltz plaintiffs received $5,000 (or 25 percent) of the liability limits and the trial court awarded them only 19 percent of the total damages awarded to all plaintiffs, the Beltz plaintiffs were paid $1,200 above their proportionate [19 percent] damages, a "sum sufficient to cover an 11 day period of interest and cost ..."
In the further alternative, State Farm suggests a remand to allow an evidentiary hearing on circumstances which underlie the stipulation and the payment because the trial court did not consider the precise issue. The issue is properly before us on the appeal of the judgment dismissing State Farm. CCP Arts. 2082-3.
The supplementary-payment obligation in the language of automobile liability policies before the 1960's produced divided and incongruous results in the cases. After the advent of the Family Automobile Policy in the late 1950's, the language was made more favorable to the insured to make it "clear that all interest on the entire amount of any judgment, which accrues after entry of the judgment, is payable by the insurer until the insurer has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the insurer's liability [under the judgment]." See discussion and authorities in Doty v. Central Mutual Insurance Company, 186 So.2d 328, 335, on rehearing, (La.App.3d Cir.1966), writ refused. Our emphasis.
The language in Fletcher, supra, and in this State Farm policy, rewritten in an obvious attempt to make the policies more marketable to prospective insureds, indicates that these insurers intended to continue the supplementary-payment coverage that had been provided for decades under the Family Automobile policies.
*281 We shall therefore construe the language in the State Farm policy, with all of its recognized and obvious shortcomings, as Fletcher construed the language in the Leader National policy. State Farm owes interest on the entire judgment in favor of the Beltz plaintiffs from date of judicial demand until October 8, 1984, the date it paid the limits of its liability coverage ($20,000). We shall amend the judgment accordingly.
We reach this conclusion on the basis of the entirety of the policy, notwithstanding that the insurer uses the words "in addition to the limits of liability" with the words "we will pay interest ... until we pay the amount due under this coverage." The term this coverage must be construed as synonymous with "the liability coverage under this policy" or with "the limits of liability provided under the coverage of this policy." Any other construction would produce the absurdity of compelling a liability insurer whose insured is exposed to a damage suit judgment greatly in excess of the liability limits to attempt the impossible and make an early and perilous "guess" and payment of what the final judgment, with interest and court costs, might eventually total. In the many Louisiana cases where ambiguity in an insurance policy has been construed in favor of the insured and against the insurer, the result, in this court's knowledge and experience, has not shouldered the insurer with an impossible burden or pronounced an absurdity. Southern States Masonry v. Mission Ins. Co., 353 So.2d 307, 310 (La.App. 1st Cir. 1977), writ refused. Additionally, our result encourages liability insurers in the catastrophic injury case where minimal coverage is available in the probable cases of liability to pay or tender the policy limits to the injured plaintiff. LRS 22:655 declares that liability policies are also written for the benefit of all injured persons to whom the insured is liable.

DECREE
We adopt the excellent reasons assigned by the trial court which we have here summarized and supported.
Each judgment in the appeals under docket No. 19,570-CA and docket No. 19,606-CA are affirmed. The judgment under docket No. 19,571-CA is amended to delete the provision that plaintiffs' demands against State Farm Mutual Automobile Insurance Company are dismissed and to add in place of the deleted provision this decree:
State Farm Mutual Automobile Insurance Company is hereby decreed to be liable in solido with its insured, Bobby R. Roberts, under this judgment insofar as he is cast for costs and insofar as he is cast for legal interest on the awards in favor of plaintiffs for the period from judicial demand until the date of October 8, 1984. Costs of appeal assessed or charged to plaintiffs-appellants are assessed to State Farm Mutual Automobile Insurance Company.
In all other respects, and as above amended, the judgment in the appeal under docket no. 19,751-CA is affirmed.
Appellate costs, to the extent allowed by law, in each of the three appeals are assessed to appellant, DPS.

ON APPLICATION FOR REHEARING
HALL, MARVIN, JASPER E. JONES, SEXTON and LINDSAY, JJ.
Rehearing denied.
NOTES
[1] We address only these five errors which are asserted by DPS. Each assignment asserts that the trial court erred:

1. in holding that the DPS breached a duty to plaintiffs in the renewal of a license to Bobby Roberts.
2. in finding that DPS breached a duty to plaintiffs to formulate and carry out rules and regulations for the licensing of drivers with uncontrollable seizure disorders.
3. in finding that DPS's issuance and renewal of a license to Bobby R. Roberts was a substantial factor in the occurrence of the accident and, therefore, the cause-in-fact of the accident.
4. in finding that the probability and magnitude of the risk that a driver with a seizure disorder might be involved in a fatal accidnt far exceeded the cost to the driver and to the state in imposing more stringent restrictions on such drivers.
5. in admitting Exhibits D-W-7, D-W-8, D-W-9, D-W-100, H-W-4, H-W-5, and H-W-6 without the proper identification of these exhibits, and, accordingly, the award of damages based on these exhibits should be reduced by the appropriate amounts.