609 So.2d 1163 (1992)
Billy Floyd KNIEPP, et ux., Plaintiffs-Appellants,
v.
CITY OF SHREVEPORT, Defendant-Appellee.
S. DIG, INC. and Sam Digilormo, Plaintiffs-Appellants,
v.
CITY OF SHREVEPORT, Defendant-Appellee.
Billy Floyd KNIEPP, Plaintiff-Appellant,
v.
CITY OF SHREVEPORT, Defendant-Appellee.
Nos. 24,216-CA to 24,218-CA.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1992.
Writ Denied February 19, 1993.
*1164 Daryl Gold, Shreveport, for plaintiffs-appellants.
Jerry Jones, City Atty., Lydia M. Rhodes, Asst. City Atty., for defendant-appellee, City of Shreveport.
Before LINDSAY, BROWN and STEWART, JJ.
STEWART, Judge.
Plaintiffs, S. Dig, Inc. and Sam Digilormo, who owned Sack-N-Pack Grocery, and Billy F. Kniepp, who owned B & R Liquor and Buster's Liquor, sued the City of Shreveport for negligent acts and omissions by the Shreveport Police Department (SPD) at the scene of a homicide which allegedly triggered the "Cedar Grove riot."
After trial on the issue of liability, the trial court found that the acts or omissions of the police department were neither a legal cause nor a cause in fact of plaintiffs' damages. The trial court further found that Chief Charles Gruber's decision to redeploy the officers to the perimeter of the crime scene was a discretionary act which rendered the City of Shreveport immune under LSA-R.S. 9:2798.1. Plaintiffs appeal.

FACTS
About 9:45 p.m. on September 20, 1988, Cynthia Johnson and Tamala Vergo, both white females, drove to a Sack-N-Pack Grocery, a convenience store, which was owned by S. Dig, Inc. and operated by Sam Digilormo. The store was located next to A.B. Palmer Park on Line Avenue in Shreveport, a predominantly black area of Shreveport known as Cedar Grove. Johnson and Vergo attempted to complete a drug transaction with some black males while stopped on the store parking lot. The drug sale ended abruptly with Vergo pointing a pistol and firing two shots towards the males who began to run toward the park.
One of the shots fatally wounded William David McKinney, a young black man who was a bystander in the line of fire. An unknown person or persons in the park fired shots at the automobile, which then stalled. Both females ran from the vehicle and into the Sack-N-Pack store yelling for somebody to call the police. The police arrived within minutes and detained Johnson and Vergo. A crowd gathered outside the store, and threw rocks and bottles at the police officers, firefighters, and vehicles which were at the scene. After about an hour, the females were removed by police from Sack-N-Pack Grocery at approximately 10:45 p.m. and taken to SPD for further interrogation. The two females were later booked and charged with second degree murder in connection with this shooting incident.[1]
The crowd continued to grow both in number and in violent activity protesting the fatal shooting of McKinney. Groups of people gathered in the park, in the parking lot of the grocery store, and in the street. Shortly before 11 p.m., a patrol car windshield was broken. The crowd threw rocks which shattered glass in other vehicles. At 11 p.m., there was a report of bricks being thrown. Shortly after 11 p.m., a brush fire erupted behind the park in which the murder victim had been shot. At about 11:15 p.m., while Shreveport Fire Department (SFD) firefighters were working on the brush fire, the police officers received an order from Chief Gruber to move out of the area of the disturbance. SPD officers pulled back into the area surrounding the disturbance and firefighters were attacked with rocks. In response, the firefighters pulled back as well.
*1165 Periodically, there were reports of gunfire. As the evening progressed, people began looting Sack-N-Pack Grocery, B & R Liquor, and Buster's Liquor. Someone set fire to Sack-N-Pack Grocery. The fire spread next door to B & R Liquor, and destroyed both buildings. The events of this evening became known nationally as the "Cedar Grove riot."
Plaintiffs, who owned the businesses which were destroyed by fire, sued the City of Shreveport, alleging that it had breached its duty to plaintiffs as citizens and as property owners in the manner in which the city, through its employees, responded to the incident. Plaintiffs contended that the city's response (i.e., its actions and omissions) resulted in their loss of property. The parties presented testimony and other evidence at trial on the issue of liability.
In written reasons for judgment, the trial court found that the actions of the police officers who initially responded at the scene were operational and therefore not covered by R.S. 9:2798.1. The trial court found that, although there was evidence which indicated that SPD could have handled the crowd more efficiently, there was no basis to conclude that the actions of the responding officers were either a substantial contributing factor or a cause in fact of the subsequent events.
The trial court further determined that the decision by Chief Gruber to withdraw from the crowd was based upon the policy to not jeopardize the life and safety of the individuals involved in order to protect or salvage unoccupied property. The court found that the city's choices were reasonably related to the governmental objective at issue and, in this situation, were grounded in social, economic and political policy. Accordingly, the trial court concluded that the decision to withdraw was a discretionary decision which rendered the city immune from civil liability. Plaintiffs appeal.

DISCUSSION
At issue is whether (1) the decisions of Chief Gruber regarding protection of the plaintiffs' property, and/or (2) the actions of the responding officers with regard to the two females, give rise to liability on the part of the City of Shreveport. We shall examine the applicable principle of immunity prior to discussion of these two issues.
LSA-R.S. 9:2798.1 provides as follows:
§ 2798.1. Policy-making or discretionary acts or omissions of public entities or their officers or employees.
A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omission which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
Immunity from liability for discretionary acts, pursuant to LSA-R.S. 9:2798.1, is essentially the same as the immunity conferred on the federal government by the *1166 exception in the Federal Tort Claims Act (FTCA). Chaney v. National R.R. Passenger Corp., 583 So.2d 926 (La.App. 1st Cir. 1991). In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the United States Supreme Court developed the following two-step inquiry to examine immunity under the FTCA: (1) whether a statute, regulation or policy specifically prescribes a course of action; and (2) whether the challenged action is grounded in social, economic or political policy. The Louisiana Supreme Court has adopted this Berkovitz inquiry to analyze the applicability of the LSA-R.S. 9:2798.1 discretionary exception. Verdun v. State Dept. of Health & Human Resources, 559 So.2d 877, 879 (La.App. 4th Cir.1990); see also, Fowler v. Roberts, 556 So.2d 1, 13-16, on rehearing, (La.1990).
The application of this two-pronged inquiry was explained in Fowler, supra, 556 So.2d at 15-16, as follows:
Discretion exists only when a policy judgment has been made. Judicial interference in executive actions involving public policy is restrained by the exception. Thus, the exception protects the government from liability only at the policy making or ministerial level, not at the operational level....
If there is no room for an official to exercise a policy judgment, the discretionary function exception does not bar a claim that an act was negligent. When the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures. [Citations omitted and emphasis ours.]
Having outlined the test for LSA-R.S. 9:2798.1 immunity, we turn to the strategy and decisions of Chief Charles Gruber. After the two females were removed from the area and the crowd exhibited increased hostility, Chief Gruber ordered the police officers to pull back from the homicide area and secure the perimeter. Plaintiffs complain that firefighters left the area because they were unprotected when SPD "withdrew" from the scene. They assert that SPD's "withdrawal" therefore caused their property to burn unchecked.
The record, as a whole, indicates that the strategy chosen by Chief Charles Gruber was to protect the lives of both civilians and law enforcement officers, by (1) establishing a perimeter within which the disturbance would be contained, and (2) allowing the disturbance to die out on its own. Testimony revealed that, although some officers believed the police could have dispersed the crowd at various points during the night, Chief Gruber chose not to confront the crowd in order to avoid violence between the crowd and the officers.
Faced with a similar issue arising from a civil disturbance in the 1960's, the Florida Supreme Court stated the following in Wong v. City of Miami, 237 So.2d 132, 134 (Fla.1970):
While sovereign immunity is a salient issue here, we ought not lose sight of the fact that inherent in the right to exercise police powers is the right to determine strategy and tactics for the deployment of those powers. In the Report of the National Advisory Commission on Civil Disorders, issued pursuant to Executive Order 11365 in 1967, the point was frequently made that police visibility was often an operative factor in the raising of tensions, and that withdrawal from an area could be a highly useful tactical tool for the relaxing of tensions in certain situations. The sovereign authorities ought to be left free to exercise their discretion and choose the tactics deemed appropriate without worry over possible allegations of negligence. Here officials thought it best to withdraw their officers. Who can say whether or not the damage sustained by petitioners would have been more widespread if the officers had stayed, and because of a resulting confrontation, the situation had escalated with greater violence than could have been controlled with the resources immediately at hand? If that had been the case, couldn't petitioners allege just as well that that course of action was negligent? [Emphasis in original.]
Chief Gruber elected to pull officers back to establish a perimeter within which the disturbance could be contained so that it *1167 did not spread into the neighboring community. Faced with increasing violence and unrest from unpredictable groups of citizens, Gruber redeployed the officers to various areas surrounding the crowd. Some officers agreed with his decisions, and some officers did not.
Lieutenant Don Ashley described the situation most candidly in his response to plaintiffs' counsel regarding whether the crowd would have dispersed if a large group of police officers had moved in and requested that they leave:
A. You know that's a hard to question [sic]. Just to say, yeah, they would disperse. I've been in situations at other scenes where we've had crowds when the crowds wouldn't just disperse. And with that crowd and the situation that you had there, I couldn't honestly say that yeah, if we all approached them, all the innocent people, all the crowd, would calmly just disperse. If you confront that situation, you have a lot of variables that you do not have not [sic] control over as far as what the nucleus of the rioters, how are they going to respond. If they fire on the officers, an officer has to defend himself. And then to return fire by the officer, you've got a lot of innocent people that could be injured. And so you know it's a tough situation. We've been in it before, been in it since, since this happened, you know, not so much that you would term a riot situation, but just at any homicide scene, you know, normal thinking and normal responses don't always hold true when you're involved in a homicide type situation at a homicide scene. And it's very difficult to sit in the sterile environment of the courtroom and say, yeah, this is what people will do. It's hard to say how people will react in those types of situations.
Chief Gruber described the situation in his answers to questions by plaintiffs' counsel in this excerpt from his deposition:
A. After I arrived there, the crowd continued to grow. They had redirected their anger, I guess, if you will, or whatever you could call a mad crowd, redirected their anger toward property and started a fire behind, in A.B. Palmer Park way up on Thornhill. At least we think they started the fire. We don't know who started the fire.
Q. A fire did get started in the park?
A. Yes. Back up in the park. We called for the Fire Department to come and put it out.
Q. Did they put it out?
A. They were working it. They finally put it out. In the process, the crowd was getting extremely angry, even though I went into the crowd and tried to get them calm and tried to get them back, they were becomingit was uncontrollable. You could feel the rise in the temperature of the crowd. It was easily getting out of control. And the rocks and bricks were starting to come hard and heavy at police officers, at our vehicles and everything else. And having police officers in the crowd in that close of contact, I felt it was would [sic] not be too long before someone else would get hurt, where they would pull at a police officer or jump a police officer or where we would not be able to control what would happened [sic]. So we pulled back, pulled out. Told everyone to pull back and told them we would reorganize over at 79th and Fairfield.
The order to pull back occurred at approximately 11:15 p.m. By 11:20 p.m., there were reports of vandalization in the area. Plaintiffs' buildings were not set on fire until after 12:30 a.m.well after the crowd was out of control. Gruber explained that to allow officers to leave the perimeter to arrest looters would have weakened his control of the perimeter. Chief Gruber testified by deposition that he considered protection of property secondary to the protection of life. He also noted that many arrests were made for looting, arson, and other offenses, because many of those who committed the offenses had to leave the area through the controlled perimeter.
*1168 Prior to giving the order to move back, Gruber had observed the crowd first hand when he went into the crowd. His car had been hit by a bullet. SPD and SFD personnel and vehicles had been attacked by the crowd with bottles, rocks, bricks, etc. At the time the decision to pull back was made, the number, identity, and location of the officers was not known. The record indicates that the crowd included active participants in the disturbance, as well as groups of people who were mere observers. Testimony revealed that several officers were ready and willing to confront the crowdwith firearms if the crowd were to respond with continued violence.
The record as a whole supports the trial court finding that the city's choices were reasonably related to a public policy-based governmental objective to protect life. We find that the decision Chief Gruber made was the type of discretionary tactical decision described in Wong, supra, which the Chief of Police for the City of Shreveport should be able to make without worry about allegations of negligence.
Plaintiffs contend that Chief Gruber's decision to pull back from the crowd was merely an operational decision which implemented the city's policy to "protect and serve". We disagree. The discretion which Gruber exercised in assigning priorities to life and property was grounded in socio-economic policy. The cases cited by plaintiffs in support of their contention are inapposite because they involve discretionary application of policy, rather than discretionary choice of policy. We distinguish the instant decision from operational decisions and from discretionary decisions which do not involve policy choice.
For the foregoing reasons, we find no error in the trial court's determination that the decision to withdraw from the crowd involved a discretionary policy determination for which the City of Shreveport is immune under R.S. 9:2798.1.
Plaintiffs also challenge the trial court's determination that the actions of the initial responding officers do not give rise to liability on the part of the City of Shreveport. The officers who initially responded to the Sack-N-Pack Grocery secured the crime scene and detained the two females. There is no indication that they made discretionary policy decisions. The trial court properly found that the conduct of these officers was operational in nature, and that the R.S. 9:2798.1 immunity does not apply to their conduct. Accordingly, we turn to the question of negligence via the duty/risk analysis.
As this court stated in Nichols v. Nichols, 556 So.2d 876, 878 (La.App. 2d Cir.1990), writ not considered, 561 So.2d 92 (La.1990),
A defendant's conduct is actionable under the duty/risk analysis of LSA C.C. Art. 2315 where it is both a cause-in-fact of the injury and a legal cause of the harm incurred. The cause-in-fact test requires that "but for" the defendant's conduct, the injuries would not have been sustained. The legal causation test requires that there be a "substantial relationship" between the conduct complained of and the harm incurred. [Citations omitted.]
Each element of the duty/risk analysis is dispositive, in that, if any one element is not present, liability cannot result. Therefore, even if a defendant owes a duty to a plaintiff, defendant is not liable for damages unless the act or omission is a cause-in-fact of plaintiff's loss.
Plaintiffs assert that, if SPD had not kept the two females in the grocery store for an hour, plaintiffs would not have sustained their losses. In support of their contentions, plaintiffs offered testimony from several officers who believed that the crowd was manageable prior to the removal of the two females from the store. Mr. Digilormo repeatedly requested that the officers remove the two females from his store. The crowd grew in numbers and in hostile activity while the two females were in the store.
The evidence shows a correlation between the removal of the two females from the store and an increase in the crowd's hostility. Although the record contains evidence which shows some correlation *1169 between the length of the detention and the increased size of the crowd, there is no proof by a preponderance that the time factor was a substantial cause of either the expressed hostility or of the subsequent burning of the properties by unknown individuals.
In its duty-risk analysis, the trial court determined that the one hour detention of the two females inside Sack-N-Pack probably contributed to the crowd's hostility, but noted that the crowd was hostile and threw objects when the initial responding officers arrived on the scene. The trial court found that the conduct of the initial responding officers was not a cause-in-fact of plaintiffs' losses.
We agree with the trial court that it does not automatically follow that, if the initial responding officers had removed the two females earlier, then plaintiffs would not have sustained damages. We find no error in the trial court determination that plaintiffs did not prove by a preponderance the necessary causation between the action or inaction of SPD and plaintiffs' loss. Plaintiffs did not establish that but for the length of time the two females remained in the Sack-N-Pack Grocery, the buildings and their contents would have been savedor that the conduct of the initial responding officers was a substantial factor in the loss sustained. See and compare, McCorkle v. Eltek, Inc., 572 So.2d 215, 216-217 (La.App. 1st Cir.1990).
Plaintiffs also argue that SPD created a specific duty to these plaintiffs by its initial acts and omissions in detaining the two females. We have already found no error in the trial court determination that the department's conduct was not a cause-in-fact of plaintiffs' losses. Thus, even if (1) R.S. 9:2798.1 immunity were inapplicable, (2) SPD owed a duty to plaintiffs, and (3) the department breached its duty, such breach does not give rise to liability under the instant facts. For this reason, we do not reach the question of whether SPD owed a duty to plaintiffs.
Assuming, arguendo, that SPD had a specific duty to these plaintiffs, we note the following: Because the duty of a policeman under these circumstances is not specifically delineated by statute, we find no one-to-one duty which constitutes an exception to the public duty doctrine. See Smith v. City of Kenner, 428 So.2d 1171, 1174 (La.App. 5th Cir.1983). Likewise, we find no personal or individual relationship between SPD and plaintiffs, and hence no transformation of the public duty into an individual duty. See and compare, Kendrick v. City of Lake Charles, 500 So.2d 866, 870 (La.App. 1st Cir.1986).
We distinguish Bloom v. City of New York, 78 Misc.2d 1077, 357 N.Y.S.2d 979 (1974), cited by plaintiffs in support of their argument that SPD created a specific duty to plaintiffs. In Bloom, the court noted that a municipality can be held liable where it assumes a duty to provide police protection but does so in a negligent manner. Plaintiffs alleged that they were restrained from protecting their property by the police who assured them that proper police protection would be provided. The court found that plaintiffs alleged an affirmative series of acts by defendant which, if proven, could constitute creation or assumption of a duty to plaintiffs. Accordingly, the court denied defendant's motion to dismiss for failure to state a cause of action.
By contrast, the instant plaintiffs argue that the length of time during which the two females were detained in the grocery store by the police created a specific duty to plaintiffs. The instant case involves no allegations of affirmative acts, such as assurance of protection, by which the city assumed a special duty. Thus, although we do not reach the question of whether the city owed a general duty to plaintiffs, we note that we are not persuaded by plaintiffs' argument regarding the city's voluntary assumption of a specific duty.
Having found that the trial court was neither clearly wrong, manifestly erroneous, or in error as a matter of law, we affirm the judgment of the trial court.
AFFIRMED.
BROWN, J., dissents with written reasons.
*1170 BROWN, Judge, dissenting.
On September 20, 1988, two brick buildings fronting on Line Avenue were looted and subsequently destroyed by arson. This action seeks to hold the City of Shreveport vicariously liable for the alleged negligent acts or omissions of its police officials. The alleged negligent conduct arises in the context of the failure of the police department to provide protection and assistance. I disagree with the majority opinion which grants the city immunity under LSA-R.S. 9:2798.1 for the decisions of its police chief.
Louisiana's 1974 Constitution rejected the concept of sovereign immunity. LSA-Const. Art. 11, § 10 provides:
Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property. (emphasis added).
Since the adoption of the 1974 Constitution, the legislature has acted to restore significant areas of governmental immunity. R.S. 9:2798.1 is such an act.[1] Because the constitution unequivocally rejects governmental immunity, R.S. 9:2798.1, which limits recovery must be strictly and narrowly construed. Jones v. City of Baton RougeParish of East Baton Rouge, 388 So.2d 737 (La.1980). Moreover, the burden of proving this limitation of liability lies with the city.
R.S. 9:2798.1 is a codification of the old "public duty doctrine" which granted immunity against tort claims to the state and its subdivisions for their discretionary functions.[2] The legislature's use of the word "discretionary" is unfortunate and only adds confusion to the statute's interpretation. Practically every act of a rational being involves some choices and the discretionary function immunity must be read carefully or it will totally insulate government from responsibility for the negligent conduct of its employees. Trevino v. General Dynamics Corporation, 865 F.2d 1474 (5th Cir.1989).
Whether the conduct of police officials is immune from tort liability is a factual question which must be answered by examining the nature of the act and not the rank or status of the actor. The theory of plaintiffs' case is that the police withdrew protection, leaving plaintiffs' property to the whim of an angry crowd and then failed to protect fire fighters who were ready to return to the area to fight the fire started by the crowd.
The first inquiry is to consider whether the police official had any discretion as to what course of conduct to follow. In the instant case, it is clear that both the police chief and the officers initially responding to the homicide scene had discretion to make choices in their reaction to the emergency situation. All discretionary acts, however, are not immune from tort liability. Immunity extends only to those choices narrowly defined as policy-making or planning. Operational choices which involve the implementation of policy are not immune. It is this second step in the analysis that is by far the most difficult. See Berkovitz v. U.S., 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).
Because each case depends on its particular facts, the jurisprudence distinguishing the boundary between policy-making and operational decisions has not always been consistent or clear. The salient rule is that governmental immunity is not automatic just because the official had some discretion. It is the city's burden to prove its entitlement to immunity.
*1171 Plaintiffs owned and operated adjoining convenience stores fronting on Line Avenue in Cedar Grove. Line Avenue is a four lane major thoroughfare in the City of Shreveport. One business, Sack-N-Pack, is bordered on the south by A.B. Palmer Park, a location notorious for its bodacious dealings in illegal drugs. Two young white females drove into the parking lot of Sack-N-Pack and sought to buy drugs. The gunshots that followed left the females' vehicle disabled in the parking lot and a black male fatally wounded in the park.[3]
During the investigation and thereafter, a crowd gathered, which was estimated at varying times from 15 to 200 people. A few drug dealers either attempted to incite the crowd or threw rocks and bottles at the police and firemen. The evidence further confirmed that K-9 units, SWAT and Special Response Teams from the Shreveport Police Department, Caddo Sheriff's Office, Bossier City Police Department and Louisiana State Police were on the scene. In addition, both the graveyard and evening shifts of the Shreveport Police Department were activated. Exactly when this force of more than 100 officers came together is unclear. Although evidence demonstrated confusion as to the number and location of officers at the beginning of the incident, the city has never suggested that sufficient resources were not available to implement whatever response was selected.
Under these circumstances the decision to withdraw was an operational choice rather than one of policy-making. The decision to pull out cannot be distinguished from that of the officers who chose to hold the two females at the scene while conducting their investigation. Actually the evidence was conflicting concerning who made the decision to leave the crime scene. The transcript of the radio transmissions indicates that at 11:15 P.M. Lt. Woodard ordered all officers to leave the crime scene. Lt. Woodard gave the order after the wrecker towed the suspects' disabled vehicle from the scene. On the other hand, the radio transcripts and Woodard's testimony showed that the police chief was also at the scene at this time. The police chief testified that he gave the order for everyone to pull back and reorganize at 79th and Fairfield. The chief testified he issued the order to withdraw to prevent a confrontation between the police and crowd. Lt. Woodard testified that he did not consult the chief when he issued his order; however, Captain Morgan testified that Woodard told him the chief ordered the withdrawal. I am not sure if the majority opinion would have afforded immunity to Lt. Woodard's decision.
The decision of when to reenter the area was likewise an operational choice. The police chief testified that he decided to cordon off an area consisting of about ten (10) blocks and allow the crowd to diffuse itself. This nonconfrontational policy was chosen under the belief that a police presence would aggravate the crowd.
Policy-making decisions include budgeting concerns such as the number and location of substations, the amount of equipment to purchase, the size of the department, the number of units needed to patrol the city, the size of patrol districts, and in certain situations, where to deploy limited resources when faced with competing emergencies. The case before us is different. The resources were available to implement the protect and serve policy of the police department. The decisions to retreat and when to reenter were operational in nature. Whatever discretion existed was not based on policy.[4]
The instant case is distinguishable from Wong v. City of Miami, 237 So.2d 132 *1172 (Fla.1970), cited by the majority. In Wong when the police withdrew there was only speculation that a disturbance might occur. In the instant case, when the order was issued to pull out, the disturbance was in progress.
Having determined that the choice to withdraw and remain in a perimeter was operational in nature and not subject to immunity, we turn next to an examination of liability.
I agree with the majority that the failure to immediately remove the two females from the area by the officers initially responding to the homicide scene was not a cause-in-fact of plaintiffs' losses; however, I would add that the evidence presented did not prove that these officers violated any duty owed to plaintiffs. They responded to a homicide in an appropriate and reasonable manner. They taped off the scene and attempted to carry out a forensic investigation. They went about the task of determining what occurred and kept the two females separated from other witnesses. When they realized that it was necessary to remove the females from the scene, they called for additional support and a van. At this time, the store was protected by a perimeter of police. Under these circumstances, their actions were reasonable and not negligent.
The police chief was not notified for more than one (1) hour after the shooting. The chief arrived at the Sack-N-Pack after the females had been removed to the police station. The chief, who was surrounded by police officers, attempted to talk to the crowd. In his opinion the crowd had redirected their anger towards property and the police.[5]
The police chief decided to withdraw and told his officers to pull back and reorganize at 79th and Fairfield (approximately two blocks to the west). When the police pulled back, the fire department, which was fighting a brush fire in the park, was left without police protection. Because rocks were thrown at their truck, these firemen also retreated.
The fire chief joined the police chief at the command headquarters. One hour and twenty-one minutes after retreating to secure a perimeter, a fire was reported at Sack-N-Pack.[6] The decision was made by the police chief not to go back into the area at that time. When asked if that decision was agreed to by the fire chief, he stated:
That is a good question. I don't know the answer to that. To be honest with you, I don't know what his [fire chief] perception of our agreement was. My perception of the agreement was that it was pretty much my call as to whether it was too dangerous or not and he was going to respond accordingly. That he felt it was too dangerous, I felt too dangerous, and how he perceived that, I don't know.
Significantly, the city did not call the fire chief to testify. Thereafter, a reconnaissance team of five officers reported only fifteen people in the area of the fire. The team leader believed they could clear the area and protect firemen at that time. The team members were equipped with bullet-proof vests, ballistic helmets and heavy firepower. The team leader testified that the fire was just beginning to spread to the liquor store when he reported the estimated head count.
Clearly, the decision to withdraw and leave the area unprotected and then not respond to the Sack-N-Pack fire was a cause-in-fact of plaintiffs' losses.
The next inquiry is whether plaintiffs can articulate some general rule or principle of law that protects their interests and further, if that enunciated rule extends to protect them from this type of harm arising in this manner. The city and the police department had a general duty to protect *1173 the lives and properties of the citizens of Shreveport and therefore, owed plaintiffs a legal duty to perform that function according to reasonable standards of conduct. They also owed plaintiffs a particular duty to protect their property. In utilizing the Sack-N-Pack during the homicide investigation, they placed plaintiffs' property in jeopardy and, as testified by the police chief, were aware of the real danger from the crowd's redirected anger towards the property.
The next inquiry is whether the choices made by the police chief violated this duty owed to plaintiffs. The chief was confronted with several operational alternatives. He could have (1) immediately moved to disperse the crowd at the crime scene; (2) formed a perimeter around the Sack-N-Pack until the crowd quieted; (3) retreated, blocked off incoming traffic, regrouped and immediately acted to regain the area; or (4) as was done in this case, retreated, blocked off incoming traffic and regrouped to wait for the crowd to disperse on its own.
Many officers testified that they disagreed with the chief's choice. One officer stated he was shocked to learn "that we had given up ten city blocks of Cedar Grove and had backed out of that area and there were no police to serve and protect the citizens in that perimeter." Testimony indicated that a nursing home was directly across Line Avenue from Sack-N-Pack. The fire at Sack-N-Pack spread to B & R Liquor. Next to B & R Liquor was the Pel-State convenience store which dispensed gasoline. If the fire had spread and ignited the gasoline storage tanks at the Pel-State store, the occupants of the nursing home and surrounding residences would have been in great danger. As stated, the 5-man reconnaissance team behind the nursing home estimated only 15 people in the area. In addition, plaintiff, Billy Kniepp, who owned B & R Liquor, was just south of the Palmer Park on Line Avenue at a road block. He viewed the fire at Sack-N-Pack and confirmed the reconnaissance team's sighting of only a few people in the area. At this time, the "riot" was subsiding with only the fire remaining.
In retrospect, the decision to withdraw by the police chief may be questioned by others, but it was, in theory, a legitimate alternative. Officers on the scene of an emergency must be free to exercise choices between recognizably legitimate alternatives. Under the total circumstances, I cannot say that the tactic of withdrawal was unreasonable and thus negligent. It is possible that this nonconfrontational maneuver could have succeeded. We must judge this decision in the dimensions of the time and space in which the chief acted.
A more difficult task is to evaluate the failure to immediately dispatch a recon or Special Response Team when the fire was reported at Sack-N-Pack to evaluate the situation. This fire was a clear and present danger to both lives and property in the neighborhood. It spread from Sack-N-Pack to the adjoining liquor store and everyone feared possible ignition of the gasoline storage tanks at the Pel-State store. The intelligence reported from the area during this time frame indicated that the crowd was small. At 12:45 A.M. fireworks at the Sack-N-Pack exploded causing many onlookers to run.
In this limited situation, I believe the city's failure to respond to the fire was not reasonable and thus a breach of its duty to plaintiffs. In this respect I respectfully dissent.
NOTES
[1] See State v. Vergo, 594 So.2d 1360 (La.App. 2d Cir.1992), writ denied, 598 So.2d 373 (La.1992), where Tamala Vergo's conviction for manslaughter in the death of William David McKinney was affirmed.
[1] Surprisingly no case has questioned the constitutionality of R.S. 9:2798.1. See, however, Sibley v. Board of Supervisors of Louisiana State University, 462 So.2d 149 (La.1985), which found statutes limiting the amount of malpractice awards not unconstitutional. Also, see Industrial Risk Insurers v. New Orleans Public Service, Inc., 735 F.Supp. 200 (E.D.La.1990).
[2] The public duty doctrine of the 1970s provided that a city cannot be held liable for the failure to furnish adequate police protection because this duty flows only to the general public. This court in Fowler v. Roberts, 526 So.2d 266 (La. App. 2d Cir.1988), affirmed, 556 So.2d 1 (La. 1990), rejected the old public duty doctrine stating: "See Stewart v. Schmeider, 386 So.2d 1351 (La.1980), holding that a public agency may be held liable for a breach of a duty owed to the general public."
[3] Although both girls were indicted for second degree murder, one was acquitted and the other convicted of manslaughter. State v. Vergo, 594 So.2d 1360 (La.App. 2d Cir.1992).
[4] This view is further supported by the legislature enacting, the year following this incident, LSA-R.S. 9:2793.1 which granted immunity to public entities like the city and its employees from damages to property at the site of a crime, accident or fire. All that must now be shown to immunize the city and its employees is that the actor was "taking reasonable remedial action... necessary to abate a public emergency." This act is not retroactive and was passed to relieve officers and fire fighters from the threat of a lawsuit when responding to an emergency.
[5] The chief's vehicle did not sustain damage from a bullet at this time. This occurred later when the vehicle was used by a recon team.
[6] The radio logs show Lt. Woodard's order to withdraw was at 11:15 P.M.; at 11:45 P.M., the perimeter was reported secured; at 12:36 A.M., Officer Philly reported the fire; at 12:45 A.M., fireworks located at the Sack-N-Pack exploded; at 12:56 A.M., the SPD SRT arrived with the van at headquarters and, at 2:08 A.M., the recon team reported.