627 So.2d 732 (1993)
Evan R. JOHNSON and Janet Johnson, Plaintiffs-Appellants,
v.
DEPARTMENT OF PUBLIC SAFETY, et al., Defendants-Appellees.
No. 25225-CA.
Court of Appeal of Louisiana, Second Circuit.
December 1, 1993.
Rehearing Denied January 13, 1994.
*734 J. Arthur Smith, III, Baton Rouge, for appellants.
Richard Ieyoub, Atty. Gen., Bobby L. Culpepper, Sp. Asst. Atty. Gen., Jonesboro, for appellees.
Before MARVIN, LINDSAY and WILLIAMS, JJ.
LINDSAY, Judge.
The parents of a young man killed in an automobile accident brought suit against the Department of Public Safety (DPS) for renewing the unrestricted driver's license of a seizure-prone driver who collided with their son's car during an epileptic seizure. The trial court dismissed the parents' suit, and they appealed. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS
In 1979, Jessie G. Pesnell applied to the Department of Public Safety (DPS) for a driver's license. At that time, Pesnell had no unusual health problems. Accordingly, he was issued an unrestricted driver's license.
In 1981, Pesnell suffered from spinal meningitis and developed epilepsy with accompanying seizures. Thereafter, he remained on prescribed medication which helped to control his seizures.
In 1983, he went to the DPS office in Ruston to renew his driver's license. Pesnell testified that he disclosed his medical condition to the DPS personnel at that time, and again in 1987 when he renewed his driver's license. He testified that, in spite of his disclosures, DPS nonetheless issued an unrestricted driver's license to him on both occasions without even requesting medical information from his treating physician. However, DPS denied that any such disclosures were made to its employees.
On March 16, 1989, while operating his automobile in Ruston, Louisiana, Pesnell suffered a seizure. As a result of the seizure, he lost control of his vehicle, which crashed at a high rate of speed into a car driven by Richard Shay Johnson, the 18-year-old son of Evan R. Johnson and Janet Johnson. Shay died as the result of injuries sustained in the accident.
On March 16, 1990, Shay's parents filed suit against DPS. They contended that DPS was negligent in issuing an unrestricted license to a person who was known to be prone to seizures, particularly when DPS employees failed to make any inquiry into his medical condition. They further asserted that DPS was negligent in failing to institute procedures for monitoring the medical condition and driving ability of such seizure-prone drivers.
DPS answered, denying the plaintiffs' allegations and asserting governmental immunity under LSA-R.S. 9:2798.1. DPS also filed *735 a third-party demand against Pesnell. In his answer to the third-party demand, Pesnell stated that he had filed for bankruptcy.
Trial was held in February of 1992. Pesnell testified that when he renewed his license he wrote the information about his medical condition on the back on a DPS form in response to a question contained therein. However, several DPS employees from the Ruston Office of Motor Vehicles testified that at the time of Pesnell's renewals in 1983 and 1987 they were not required to inquire about any changes in a renewal applicant's health. They also testified that there were no renewal forms which contained any such questions.
On October 13, 1992, the trial court issued a written opinion in which it denied the plaintiffs' claims. The court distinguished the present case from Fowler v. Roberts, 556 So.2d 1 (La.1989). In that case, the Supreme Court found that DPS could be held liable to motorists injured in an accident caused by a seizure-prone driver's operation of a vehicle while under the effects of a seizure when DPS (1) issued a license to that driver with knowledge of the seizure-producing condition, (2) failed to institute reasonable procedures for monitoring the driver's known condition, and (3) automatically reissued the license three years later without inquiry into the driver's current condition.
In distinguishing the present case from Fowler, supra, the trial court relied upon the fact that the driver in that case was afflicted with epilepsy when he made his first application for a license, whereas the driver in the instant case, Pesnell, was not. The trial court found that Pesnell had never informed DPS of his seizure-prone medical condition. In rejecting Pesnell's testimony to the contrary, the trial court observed that his demeanor was one of "intense sorrow and guilt over the needless tragedy that he had caused." The court stated that it believed that Pesnell's testimony was motivated by an attempt to lessen his own guilt by placing blame on someone else. Consequently, the trial court concluded that it did not believe Pesnell's testimony that he had disclosed his condition to DPS.
The trial court further found that the testimony of the DPS employees was credible and that it was inconceivable that they would have taken no action if they had been informed of such a condition, particularly since the 1983 automobile accident that gave rise to the Fowler case also occurred in Lincoln Parish. Therefore, as the trier of fact, the trial court specifically found that the Department, through its employees, had no knowledge of Pesnell's condition.
The court then considered whether the department was liable for not having procedures requiring a renewal applicant like Pesnell to fill out a medical questionnaire prior to May, 1989. (The record shows that in May of 1989 DPS implemented changes in its procedures and required such forms to be filled out in response to the appellate court ruling in the Fowler case, which found DPS liable.) The trial court found no liability, noting that there was no statutory mandate requiring DPS to obtain a medical questionnaire upon renewal from a person who had not disclosed a medical problem. The court also refused to "second-guess" DPS' methods of discovering the possibility of a seizure-prone driver, especially since the court did not believe that Pesnell would have disclosed his condition.
Accordingly, judgment was rendered dismissing the Johnsons' demands against DPS and assessing costs against them.
The plaintiffs appealed. They assign as error the following: (1) the trial court was clearly wrong in rejecting Pesnell's testimony that he disclosed his epilepsy to DPS; (2) the trial court erred in distinguishing the facts of the present case from those of Fowler, supra; and (3) the trial court erred in dismissing the plaintiffs' suit.

TRIAL COURT'S FACTUAL FINDINGS
The plaintiffs contend that the trial court committed manifest error in refusing to believe Pesnell's uncontradicted testimony that he disclosed his condition to DPS. They argue that the appellate court is not bound by the trial court's credibility determination because it is "unreasoned and extremely unreasonable."
*736 In support of their position, the plaintiffs argue that Pesnell was a disinterested witness whose credibility was not impeached. The plaintiffs also point to DPS' failure, or inability, to produce Pesnell's 1983 renewal application, the document upon which Pesnell claimed to have noted his condition.
In Rosell v. ESCO, 549 So.2d 840 (La.1989), the Louisiana Supreme Court discussed the standard by which appellate courts are bound to evaluate the correctness of a trial court's findings of fact:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo....
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.... [Citations omitted.]
Contrary to the assertions of the plaintiffs, Pesnell's credibility was called into serious question on several matters. Pesnell testified that in the year preceding the accident, his seizures were "fairly well under control" and that he had perhaps one seizure per month. However, Dennis Wallace, his employer at the Ruston Sonic Drive-In, testified that, in the 12-month period before the accident, Pesnell had three or four seizures "in a good month." Furthermore, he observed Pesnell have as many as three seizures in one day. Although he did not believe Pesnell could safely drive with his medical condition, Wallace testified that he had never personally discussed the matter with Pesnell or reported him to the authorities. Wallace did, however, testify that he was aware that other persons had talked to Pesnell about the hazards of his driving with his condition.
We agree with the trial court that Wallace was a "more" disinterested witness than Pesnell and, as such, his testimony was entitled to greater weight. As noted by counsel for DPS at oral argument and by the trial court in its opinion, Pesnell cannot truly be considered "disinterested." He is apparently still burdened by his role in Shay Johnson's tragic death. The trial court had the benefit of observing Pesnell's demeanor as he testified. Based upon this observation, the trial court concluded that Pesnell's testimony was substantially colored by his feelings of guilt.
Most importantly, on the issue of disclosure of his medical condition to DPS, Pesnell testified that he had written down on the back of a renewal form that he had epilepsy and that the statement had been drawn to the attention of one of the DPS employees. *737 (However, at trial he could not even recall the gender, much less the identity, of this employee.) Pesnell specifically testified that he made the disclosure on the application because the application itself asked for that information and he felt he had to respond to the question truthfully. However, the testimony of DPS employees demonstrated that, at the time of Pesnell's renewals in 1983 and 1987, DPS had no renewal applications posing any such questions. DPS did not begin inquiring into the medical condition of renewal applicants until May 15, 1989, after the rendition of the appellate court decision in the Fowler case. (The Second Circuit's opinion in that case was issued in May of 1988; the Supreme Court's original opinion was issued on September 12, 1989, and its opinion on rehearing was handed down on February 5, 1990.)
The plaintiffs also contend that DPS' failure or inability to produce the documentation concerning Pesnell's renewals must be construed adversely against DPS. Generally, the failure of a litigant to produce evidence within his reach raises the presumption that the evidence would have been detrimental to his case. However, this presumption is not applicable when the failure to produce the evidence is explained. Babineaux v. Black, 396 So.2d 584 (La.App. 3d Cir.1981).
Several DPS employees testified that the local office did not retain the large amount of paperwork that passed through their office; instead, the documents were sent to DPS headquarters in Baton Rouge. A computer search of DPS records found no documents relating to Pesnell's renewals.[1] In fact, the experienced DPS employees who processed renewal requests indicated that during the time in question, a renewal applicant did not sign a form or application per se. Rather a "name card" was signed which was used to affix the person's signature onto the actual driver's license. Additionally, John J. Politz, the assistant secretary of the Office of Motor Vehicles, testified by deposition that he did not know whether DPS customarily retained or destroyed any renewal documents. Although he knew that DPS formerly microfilmed all documents, he testified that departmental cutbacks might have altered that procedure.
Nothing in the record before this court supports a conclusion that DPS deliberately destroyed or withheld Pesnell's records in order to conceal any information contained therein. To the contrary, it appears that there was no application to produce.
Based on the foregoing, we cannot conclude that the trial court committed manifest error in its determination concerning Pesnell's credibility and its consequent finding that DPS was unaware of Pesnell's condition.
Therefore, this assignment of error is meritless.

APPLICABILITY OF FOWLER v. ROBERTS
Having concluded that the trial court was not clearly wrong in its finding that Pesnell did not disclose his condition to DPS, we must now consider the applicability of the holding in the Fowler case to the facts of the present case.
As previously noted, Fowler involved a situation wherein Roberts, a known seizure-prone driver, made an initial application for a Louisiana driver's license. He voluntarily disclosed his condition, and he was required to submit a medical report from his doctor verifying that he had been seizure-free for one year, was under regular medical care, and was taking medication to control his condition. The medical report also contained his doctor's opinion that he was able to drive safely from a medical standpoint. Accordingly, Roberts was issued a regular driver's license. Several years later, his license was automatically renewed without any inquiries as to his current health. By this time, his condition had deteriorated to the point that his medication could no longer control the seizures, which he was experiencing regularly. Three years later, one of Roberts' seizures caused him to be involved in a three-car collision that killed two individuals and seriously injured three others.
*738 In Fowler, the trial court found that DPS had a duty to regulate evaluations and screenings of seizure-prone drivers before original or renewal licenses were issued, and that DPS had breached its duty in automatically renewing Roberts' license because it had no procedures to determine the current health of a known seizure-prone driver. The appellate court affirmed, concluding that DPS should be held liable for its failure to provide any safeguards after the initial licensing of the known seizure-prone driver. See Fowler v. Roberts, 526 So.2d 266 (La. App. 2d Cir.1988).
The Supreme Court granted writs and likewise affirmed, stating as follows:
We hold that a driver's licensing agency which issued a license to an applicant known to be subject to a condition that produced seizures in the past and was likely to do so in the future, which failed to institute reasonable procedures for monitoring the condition of the driver, and which automatically reissued the license three years later without inquiry into the driver's current condition, may be held liable to motorists injured in an accident caused by the driver's operation of a vehicle while under the effects of a seizure.[2] [Emphasis ours.]
556 So.2d at 3.
DPS contends that the trial court correctly found that Fowler was inapplicable to the facts of the present case. We agree. Our review of Fowler demonstrates that the duty imposed upon DPS in that case was premised upon DPS issuing a license to a driver who was known to be seizure-prone but nonetheless failing to implement any means by which to monitor his condition and his continuing ability to safely operate a vehicle. Those facts are not present here where Pesnell was not a known seizure-prone driver when he first applied for a driver's license. Consequently, we find Fowler to be inapplicable.

DUTY OF DPS
As noted above, the holding of Fowler is not applicable to the facts of the instant case because the DPS had no knowledge it was dealing with a seizure-prone driver. However, the question remains as to whether Fowler should be extended to encompass the present fact situation.
In footnote 8 of the Fowler opinion, the Supreme Court noted:
Although DPS emphasizes that many physical conditions develop after the initial issuance of licenses, the present case does not present that factual situation. Whether DPS has the responsibility to inquire of renewal applicants about substantial changes in their physical condition since the issuance of their last license is a question left for another case.
556 So.2d at 7.
Such a case is presented here. The issue is whether DPS had the duty, by statute or rule of law, to inquire of all renewal applicants (including those who had never had, or at least not reported, any prior handicaps or health problems) whether they have had changes in their physical conditions since the issuance of their last license which would make it unsafe for them to continue to drive.[3]
At the time of Pesnell's renewals, the relevant statutes establishing the authority and duties of DPS were as follows:
LSA-R.S. 32:403.2:
Every physically handicapped person applying for a license under the provisions of this Chapter for the first time shall attach to his application a detailed medical report, or a report from an optometrist if it is a visual defect, from a physician indicating the severity of his disability and the limitations imposed thereby which might impair the applicant's ability to exercise ordinary and reasonable control in the operation *739 of a motor vehicle. The department may waive the furnishing of said report by any person applying for a renewal license under the provisions of this Chapter. [Emphasis ours.]
LSA-R.S. 32:414:
E. The department may conduct an investigation to determine whether the license shall be suspended, cancelled, or revoked upon a showing by its records or other sufficient evidence that the licensee:
. . . .
(5) Is incompetent to drive a motor vehicle.
. . . .
(8) Is afflicted with such mental or physical infirmities or disabilities as would constitute grounds for refusal of a license.
LSA-R.S. 32:423:
The department upon issuing a driver's or chauffeur's license shall have authority whenever good cause appears to impose restrictions suitable to the licensee's driving ability with respect to the type of, or special mechanical control devices required on, a motor vehicle which the licensee may operate or such other restrictions applicable to the licensee as the department may determine to be appropriate to assure the safe operation of a motor vehicle by the licensee.
The department may either issue a special restricted license, or may set forth such restrictions upon the usual license form.
The department may upon receiving satisfactory evidence of any violation of the restrictions of such license suspend or revoke the same but the licensee shall be entitled to a hearing as upon a suspension or revocation under this Chapter.
No person shall operate a motor vehicle in violation of the restrictions imposed in the license issued to him.
LSA-R.S. 32:424:
The department, having good cause to believe that a licensed driver or chauffeur is incompetent or otherwise not qualified to be licensed, may upon written notice of at least ten days to the licensee require him to submit to an examination. Upon the conclusion of such examination the department shall take action as may be appropriate and may suspend or revoke the license of such person or permit him to retain such license, or may issue a license subject to restrictions as permitted under R.S. 32:423. Refusal or neglect of the licensee to submit to examination shall be ground for suspension or revocation of his license.
The determination of whether a particular duty should be imposed on a particular governmental agency is a policy question. A duty may be imposed by legislation or by a rule of law. Fowler, 556 So.2d at 7.
Our examination of the relevant statutes compels us to conclude that at the time of Pesnell's renewals, DPS had no statutorily imposed duty to question renewal applicants about changes in their medical conditions since the last issuance of their driver's licenses. A careful review of the above quoted statutes demonstrates that DPS had a duty, established by statute, to take certain actions when dealing with persons with a known handicap or medical condition, such as in the Fowler case. That duty did not encompassed the situation in the present case. In order to impose such a duty upon DPS, we would have to expand the duty well beyond the obvious legislative intent of the statutes themselves.
Nor do we find that DPS is liable for its failure to write regulations requiring that such inquiries be made to all renewal applicants. The plaintiffs have cited no persuasive authority for imposition of such a duty upon DPS; nor have we independently discerned a basis for that sort of liability on our own.
Therefore, DPS is not liable to the plaintiffs for its issuance of a renewal license to Pesnell. This assignment of error is without merit.

IMMUNITY FROM LIABILITY
Even assuming arguendo that DPS is liable for its failure to inquire into the current health of all renewal applicants, we find that DPS is immune from tort liability under *740 the provisions of LSA-R.S. 9:2798.1, which provides, in relevant part:
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
The Louisiana discretionary function exception to state governmental liability set forth in LSA-R.S. 9:2798.1 is essentially the same as the federal discretionary function exception contained in the Federal Tort Claims Act. Fowler, 556 So.2d at 15; Kniepp v. City of Shreveport, 609 So.2d 1163 (La.App. 2d Cir.1992), writ denied, 613 So.2d 976 (La.1993).[4]
In its plurality opinion on rehearing in the Fowler case, the Louisiana Supreme Court set out a two-step inquiry, derived from Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), to determine whether the policy-making or discretionary acts doctrine applied in a specific fact situation. First, a court must determine whether the government employee or agency had an element of choice. If a statute, regulation, or policy specifically prescribes a course of action for an employee or agency to follow, then the employee or agency has no rightful option but to adhere to the directive. If the employee or agency had no discretion or choice as to the appropriate conduct, there is no immunity. When discretion is involved, the court must then determine whether that discretion is the kind which is shielded by the exception, that is, one grounded in social, economic or political policy. If it is, then the doctrine applies. If it is not, the employee or agency is liable for any negligence. Fowler, supra.
The application of Berkovitz was explained in Fowler, 556 So.2d at 15, as follows:
Discretion exists only when a policy judgment has been made. Judicial interference in executive actions involving public policy is restrained by the exception. Thus, the exception protects the government from liability only at the policy making or ministerial level, not at the operational level.
. . . .
If there is no room for an official to exercise a policy judgment, the discretionary function exception does not bar a claim that an act was negligent. When the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures. [Citations omitted.]
We recognize that under the "operational test" it is arguable that the DPS employee who renewed Pesnell's license was acting without any choice or discretion, thus precluding application of the discretionary exception. However, the real question here concerns the actions of the DPS policy-makers who established the rules for license renewals.[5]
*741 If liability was imposed upon DPS under the facts of this case, it could only be for negligent policy making, not any act or omission by its officers or employees in carrying out law or policy previously established by the legislature or DPS. As stated by Justice Dennis in his dissent to the original decision in Fowler, "[i]mplementation of rules and procedures for the issuance and renewal of drivers' licenses for the protection of the public is plainly a discretionary or policy making activity."
We agree and find that DPS is entitled to governmental immunity under LSA-R.S. 9:2798.1.

CONCLUSION
For the reasons assigned above, the judgment of the trial court is affirmed. Costs are assessed against the appellants.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, SEXTON, LINDSAY, HIGHTOWER and WILLIAMS, JJ.
Rehearing denied.
NOTES
[1] The response to the computer search declares that, "This is a report from data to locate any old renewal forms for this drivers license number, if any on file. In this case, none found."
[2] On rehearing, a plurality of the court further found that the discretionary function exception to governmental liability provided in LSA-R.S. 9:2798.1 did not apply to immunize DPS. Issuance of a renewal license was not a discretionary act by a state employee where DPS, in its interpretation of the provisions of LSA-R.S. 32:403.2, infra, adopted a policy of waiving all medical reports for renewals of handicapped drivers.
[3] We recognize that, as a result of the Fowler decision, DPS now makes such inquiries of all renewal applicants.
[4] In their supplemental brief, the plaintiffs contend that LSA-R.S. 9:2798.1 is unconstitutional because it violates the Louisiana constitutional proscription against sovereign immunity. LSA-Const. Art. XII, § 10. However, the statute is not unconstitutional on its face. See Chamberlain v. State of Louisiana, Through the Department of Transportation and Development, 624 So.2d 874 (La.1993). Nor did the plaintiffs attack the constitutionality of the statute in the trial court. Consequently, the claimed unconstitutionality of the statute is not properly before this court. Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984).
[5] DPS further argues that two years after the Louisiana Supreme Court approved the "operational test" in the Fowler case, the United States Supreme Court repudiated that test in United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The possible ramification of the Gaubert case on Louisiana's discretionary function exception has been the object of scholarly discussion. See John C. Anjier & James A. Brown, Recent Developments Affecting Louisiana's Discretionary Function Exception: Will Louisiana Follow Gaubert?, 53 La.L.Rev. 1487 (1993). However, because of our finding of immunity on the part of DPS, we find it unnecessary to address this issue.